945 F.2d 667
 MIDNIGHT SESSIONS, LTD., t/a After Midnight, Baker Ocean,
Inc., t/a Down South, Good Times Cafe, Inc., Donald R.
Welch, Sally Hunter, Jack Manoff, Richard Singer, and Curt
E. Heidinger, Appellees-Cross-Appellants,
v.
CITY OF PHILADELPHIA, City of Philadelphia Police
Department, City of Philadelphia Department of Licenses &
Inspections, City of Philadelphia Board of License &
Inspection Review, Alan Kessler, Esq., James F. Jordan, Jr.,
James P. Lynn, Anthony P. Rabutino, Carl Schmollinger, Larry
A. Thomas, James J. Tayoun, John Plonski, Henry Herling,
Robert J. D'Agostino, Clarence Mosley, Cureley Cole, Esq.,
Joan S. Baizer, Charles L. Duncan, Jr., West Poplar Action
Committee, South Street Business Association,
City of Philadelphia, Appellant,
James J. Tayoun, Cross-Appellee.
 Nos. 91-1055, 91-1109 and 91-1140.
 United States Court of Appeals,
Third Circuit.
 Argued July 24, 1991.
Decided Oct. 2, 1991.
Rehearing Denied Oct. 28, 1991.
 
 Richard G. Freeman (argued), Deputy City Sol., Philadelphia, Pa., Mark Rahdert, Philadelphia, Pa., for appellant-cross-appellee.
 Michael G. Trachtman (argued), Jonathan K. Hollin, Ethan N. Halberstadt, Powell, Trachtman, Logan & Carrle, King of Prussia, Pa., for appellees-cross-appellants.
 Before SLOVITER, Chief Judge, GREENBERG, Circuit Judge, and McCLURE, District Judge.*
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 In this civil rights action, the City of Philadelphia appeals from an order entered February 11, 1991, denying it a judgment notwithstanding a verdict in favor of the plaintiffs Midnight Sessions (After Midnight), Baker Ocean, Inc. (Down South), and several of their individual investors, who alleged that the City violated their constitutional rights by denying their applications for dance hall licenses. In particular the plaintiffs pleaded causes of action under 42 U.S.C. § 1983 claiming that they had been denied substantive and procedural due process of the law and that their property had been unconstitutionally taken. The plaintiffs also alleged that the City denied them equal protection of the laws, asserting in this regard, among other things, that it engaged in intentional race discrimination because it would not license the dance halls as they were in white neighborhoods, but catered to a young black clientele. In addition, Down South asserted that the City unconstitutionally harassed it by repeatedly citing it for City fire code violations. The plaintiffs also advanced a count for racial discrimination predicated on their clientele under 42 U.S.C. §§ 1981, 1982, 1985 and 1986 and a RICO count.
 
 
 2
 The verdict was returned on interrogatories and was based on three findings that the City violated the plaintiffs' rights to procedural and substantive due process of law and took their property without just compensation. The City, however, was found not liable for racial discrimination and the RICO count and equal protection counts were dismissed before trial. The jury awarded $2,553,000 to After Midnight and $522,000 to Down South in lump sums without a breakdown on particular bases for liability. The district court by an order entered on January 14, 1991, from which the City also appeals, granted attorneys' fees and costs of $644,460.40 to the plaintiffs. Though, as we later explain, the plaintiffs cross-appealed from a pretrial order granting judgment to an individual defendant, James J. Tayoun, we will refer to the plaintiffs as the appellees as the City is the principal appellant.
 
 
 3
 On a motion for summary judgment decided before the trial, the district court held that the appellees' loss of investment in the dance halls could be a taking without just compensation but deferred for decision at trial the question whether there had been a taking. Furthermore, the court in a pretrial ruling characterized the due process issue as whether the City's licensing procedure in this instance was arbitrary and capricious, determining that the jury would decide that. We conclude that the district court should have granted the City's motion for summary judgment and motion for judgment notwithstanding the verdict on the takings and procedural due process claims as well as on the substantive due process claim of Down South. Furthermore, we conclude that the district court erred in its disposition of the substantive due process claim of After Midnight as it instructed the jury to decide a legal issue which should have been determined by the court. Accordingly, we will reverse and direct entry of judgment for the City on all issues except for the substantive due process claim of After Midnight which we will remand for a new trial.[1]
 
 I. FACTS AND PROCEDURE
 A. AFTER MIDNIGHT
 
 4
 The case is complicated both legally and factually and we therefore describe it at length. In June 1987, Jack Manoff and other investors decided to open a new club, "After Midnight," at property they were leasing at 1004-26 Spring Garden Street, Philadelphia, which was to include an arcade, restaurant, roller skating rink, movie theater, and a dance floor to accommodate as many as 2,780 persons. The investors contemplated that After Midnight would feature live entertainment. They intended to operate the skating rink from 10 a.m. to 10 p.m. and an all-night disco from 10 p.m. to 10 a.m. After Midnight obtained zoning and building permits to convert the Spring Garden Street property into the club. In February 1988, After Midnight applied for a dance hall license, which the City's Department of Licenses and Inspection ("L & I"), following its established though unwritten procedure, refused to accept, returning it with a notation that a certificate of occupancy was required before the application. Ultimately After Midnight completed the construction and passed all inspections so that it received its certificate of occupancy on April 27, 1988. It then reapplied for a dance hall license.
 
 
 5
 In January 1988, the commanding officer of the applicable police district, Captain Barcliff, reported to the central police division that community opposition to the new dance club was growing. Area residents and businesses were understandably concerned about the large numbers of juveniles expected to attend the dances (3,000-5,000) and contemplated problems from congestion, vandalism, drinking and drugs, noise, muggings, and general disorder. According to Barcliff, After Midnight planned to operate the club throughout the night on Fridays, Saturdays, and Sundays. He concluded that "[i]t is my opinion that the large crowd that is expected would pose a real problem for the neighborhood and the police." In March 1988, Barcliff again reported to the central police division that the opponents in the neighborhood cited "potential increases in vehicle traffic, noise, disturbances on the street, drugs, etc."
 
 
 6
 Events unfolded as Barcliff anticipated. Following the opening of After Midnight without its dance hall license on May 13, 1988, its operations caused neighbors to complain that it disrupted the neighborhood with noise, trash, drugs, and alcohol; that large numbers of people were roaming the neighborhood or loitering; that patrons were harassing and frightening neighbors; and that patrons were urinating in the street. L & I cited After Midnight for operating without the dance hall license on May 13, but did not cite it for May 14 and 15 despite its continued operation. On May 20, L & I denied After Midnight's application for a dance hall license, the notice of denial indicating that it had been denied due to "Police Disapproval--Objection of neighbors." The notice also stated that an appeal from the disapproval could be filed with the Board of License Inspection and Review within 30 days. After Midnight did appeal but the Review Board affirmed the denial at a hearing on May 31, 1988. The Review Board indicated that the "neighborhood testimony was unanimous, unwavering, and we are pursuaded by the problems that seem to have arisen since the dance hall began in operation in May." After Midnight then appealed to the Court of Common Pleas but it later withdrew the appeal.
 
 
 7
 In September 1988, After Midnight requested that the Review Board reconsider its denial, but this request was denied on October 25, 1988, the board noting that After Midnight had appealed from the original denial to the Court of Common Pleas and had not obtained relief. The Review Board therefore regarded the matter as concluded. After Midnight reapplied for a dance hall license on October 31, 1988, but L & I indicated that it could not accept the application for three months.[2] After Midnight then sought and obtained a writ of mandamus from the Court of Common Pleas requiring L & I to accept its application. But L & I denied that application on November 29, 1988, noting police disapproval, and stating that its decision was:
 
 
 8
 [b]ased on the opposition of various community groups, business persons and nearby residents (within a two block radius) along with the fact that the anticipated large crowds would pose a problem for the neighborhood and to the police department's ability to deliver protective services to the entire community.
 
 
 9
 App. at 1987.
 
 
 10
 After Midnight again appealed to the Review Board which, after a hearing on December 12, 1988, ordered L & I to grant the dance hall license. After Midnight thereafter operated as a dance hall for six months before going out of business.
 
 
 11
 As we have indicated, in its complaint against the City, After Midnight contended that the City's actions constituted both a taking of its property without just compensation and a violation of its procedural and substantive due process rights, and that the City intentionally discriminated against it on the basis of race because its anticipated clientele was primarily young blacks. It also contended that Councilman James J. Tayoun, who actively opposed its application and was a defendant, had inappropriately and illegally meddled in the process. It alleged that the City was liable under 42 U.S.C. § 1983 for the constitutional violations, 42 U.S.C. §§ 1981, 1982, 1985 and 1986 for the racial violations, and 18 U.S.C. § 1961 et seq. for RICO violations. In addition, certain other individuals associated with the City, including members of the L & I board, as well as private persons and organizations, were defendants but they are no longer parties, having been dismissed from the case prior to or at trial, and are not involved in this appeal.
 
 B. DOWN SOUTH
 
 12
 In June 1988, some of the same investors purchased a much smaller property at 425-27 South Street, Philadelphia, at which a licensed dance club called "Glitters" had previously operated. They planned to convert this property into an after-hours dance club known as "Down South." Down South opened without a dance hall license and was cited by L & I for this violation. It subsequently applied for a dance hall license on September 19, 1988, but L & I denied the application on October 14, 1988, based on a police department report that recommended disapproval and cited community objections. The police report indicated that neighbors objected to the all-night hours, loud noise, public urination, and trash. On November 10, 1988, Down South appealed this determination to the Review Board, asserting that "community objection" was an insufficient ground for disapproval but it did not pursue this appeal.
 
 
 13
 After Down South applied for the license, L & I cited it for various fire code violations. In particular, on September 28, 1988, L & I cited it for failure to recharge fire extinguishers and to post conspicuously a sign indicating the maximum occupancy. The notice of violation clearly stated that reinspection would occur within the next 30 days but it also indicated a location at which Down South could obtain the sign. On September 30, 1988, L & I reissued a notice citing the same violations, including the statement "[a]ll operations must cease if these violation [sic] are not corrected in the time specified i.e. immediately." The City denied an application for a certificate of occupancy on October 14, 1988, and Down South did not appeal from this denial. The engineer who examined the facility stated that the plans Down South submitted were unacceptable.
 
 
 14
 Down South asserted claims similar to those of After Midnight and, in addition to suing the City and Tayoun, it, like After Midnight, sued certain other public officials and private individuals and organizations but all were dismissed either prior to or at trial and thus are not parties to this appeal. Down South also alleged that the inspections were acts of harrassment which put it out of business as it ran out of money.
 
 C. MOTIONS IN THE DISTRICT COURT
 
 15
 The City filed pretrial motions to dismiss and for summary judgment which were partially successful as the district court ultimately dismissed the equal protection, RICO and 42 U.S.C. §§ 1985 and 1986 conspiracy claims against it, though it would not dismiss the due process and taking claims. The court determined that the parties agreed that the City maintained a long-standing policy to apply police and neighborhood approval to dance hall licensing, a policy the court considered might support municipal liability under 42 U.S.C. § 1983. The court, however, did not decide whether neighborhood objections are a valid legal basis upon which to deny a dance hall license, instead leaving that question to the jury to answer. It did state that the appellees had property interests in receipt of the dance hall licenses if they satisfied the objective criteria required for dance hall licensing, relying on Winsett v. McGinnes, 617 F.2d 996, 1007 (3d Cir.1980) (in banc), cert. denied, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981) and Second & Ashbourne Associates v. Cheltenham Township, No. 88-6400 (E.D.Pa. July 28, 1989) (available at 1989 WL 86602). It said that the appellees met the objective rules, regulations, ordinances and laws for licensing and that L & I ultimately did issue a license to After Midnight.[3] It thus concluded that the right to approval of the licenses was a property interest.
 
 
 16
 The court noted that substantive due process included the right to be free from arbitrary government action and that arbitrariness turned on whether the government action was rationally related to the furtherance of a legitimate government interest. Again, the court concluded that a jury should resolve the question of whether the requirement of community and police approval for the licensing furthered a valid governmental interest or was simply an arbitrary and irrational supplement to the applicable objective criteria. Turning to the procedural due process claims, the court concluded that the availability of an appeal to the Review Board of L & I's decision did not establish, as a matter of law, that the City's procedure was constitutional as provided or applied and the court therefore denied the City summary judgment on the due process claims. On the unconstitutional taking of property claims, the court determined that the property taken was the appellees' "reasonable, distinct, investment backed expectations" in their dance halls. The appellees alleged that their investments for renovation, based on the expectation that they would obtain licenses when the governmental requirements were met, were lost when the City denied their applications for dance hall licenses. The court rejected the City's argument that the appellees had not lost the beneficial use of their properties.
 
 
 17
 The district court dismissed the RICO claims against the City and Tayoun, who also moved for a pretrial dismissal, by order entered July 24, 1990. The appellees do not appeal this dismissal insofar as it involved the City and thus we do not describe these claims against it further.[4] The court held that Tayoun's actions did not constitute "racketeering activity" under the statute and thus the appellees did not adequately plead the RICO count. Appellees cross-appeal from the dismissal as to Tayoun.[5]
 
 
 18
 As we have noted, the jury returned a verdict against the City on the procedural and substantive due process and taking claims, but found it was not liable for intentional race discrimination. The City then moved for a judgment notwithstanding the verdict, or for a new trial, arguing that there was insufficient evidence to support the jury's verdict that it had denied appellees' due process rights or had unconstitutionally taken their property.[6] The City also contended that the district court erred as a matter of law when it submitted the issues of substantive and procedural due process and unconstitutional taking to the jury. Finally, the City challenged the submission of certain damage claims to the jury.
 
 
 19
 In its opinion denying the motion, the district court insisted that it, not the jury, had decided that the appellees had property rights in the dance hall licenses. Thus, it had charged the jury that the appellees had property rights in the dance hall licenses and, although the City objected to the initial charge on this point, it later agreed to the language of the re-charge and did not object. The district court then concluded that there was sufficient evidence to support the jury's finding that Down South had satisfied all the objective criteria for obtaining a license. The court, without elaboration, rejected the City's contention that determination of whether the City's procedures were constitutionally adequate was a question of law for the court. It stated that there was evidence that the City told the appellees it would not consider community objections but, after the appellees appeared for their hearing without evidence, based its decision on that exact criterion.
 
 
 20
 Likewise, it concluded that there was evidence that the City closed Down South and rendered it financially unable to pursue the appeals process and that this conduct denied it procedural due process. Additionally, the court concluded that the evidence supported the jury's verdict on unconstitutional taking of property. Finally, the court rejected the City's contention that it had submitted questions of law to the jury. The court explained that many issues of material fact were unresolved and required the jury's consideration. The court insisted that it did not ask the jury to determine the constitutionality of the Dance Hall Act nor interpret that statute; rather, it stated that it instructed the jury to determine whether the City acted arbitrarily and irrationally regardless of whether the City violated the Dance Hall Act. It also concluded that a remittitur would be inappropriate. Thus, the City's post-trial motion was denied in its entirety.
 
 D. CONTENTIONS ON APPEAL
 
 21
 The City maintains that the district court erred when it submitted to the jury the question of whether the licensing procedure, including consideration of community objection, violated the appellees' constitutional rights to due process. It argues that its policy of requiring police department approval for licensing and neighborhood involvement is rationally related to a legitimate government goal and the conduct of City officials in requiring such approval was rational. The City also argues that the appellees did not have property rights in the dance hall licenses and that the statutory scheme provides adequate process to challenge the denial of a dance hall license, a conclusion the district court should have reached as a matter of law. Finally, the City contends that it did not subject appellees to a taking of property because the properties had many other uses. The City also raises contentions regarding the damages and attorneys' fees but in view of our disposition they are moot.
 
 
 22
 The appellees respond that the proper characterization of the jury question was whether in denying the licenses the City violated their rights to substantive due process because it acted arbitrarily and irrationally. They contend that there were fundamental procedural irregularities in the City's procedure. They assert that they had property interests in the dance hall licenses and in the money they had invested to rehabilitate the two buildings. They also argue that the City's unwritten policy of soliciting neighborhood approval violated procedural due process. On their cross-appeal, appellees contend that the district court erred when it dismissed the RICO count against Councilman Tayoun, contending that the district court abused its discretion in not permitting them to amend the complaint to include predicate acts of wire fraud and mail fraud.
 
 II. DISCUSSION
 
 23
 A. THE DANCE HALL ACT AND ITS ADMINISTRATION
 
 
 24
 The Dance Hall Act, Pa.Stat.Ann. tit. 53, §§ 4731-4742 (Purdon 1972), requires dance halls to obtain an annually renewable license. The mayor is charged with the duty of investigating all applications for licenses "to determine whether or not the dance hall ... sought to be licensed, complies with the rules, regulations, ordinances, and laws applicable thereto, and, in making such investigation, he shall, when desired, have the assistance of any department of the government of the city." Id. § 4735. The statute continues:
 
 
 25
 No license for a public dance hall ... shall be issued until it shall be ascertained that the place for which it is issued complies with and conforms to all laws, ordinances, health and fire regulations, applicable thereto, and is a safe and proper place for the purpose for which it shall be used, properly ventilated, and supplied with sufficient toilet conveniences.
 
 
 26
 Id. § 4736 (emphasis added).
 
 
 27
 The mayor may revoke the license of the dance hall "for disorderly or immoral conduct on the premises" or upon proof that the dance hall is frequented by disorderly or immoral persons, or for any violation of the rules, regulations, ordinances, and laws applicable to dance halls. Id. § 4737. Police may inspect dance halls at any reasonable time and may vacate the premises "whenever any provision of any law or ordinance with regard to public dances ... is being violated." Id. § 4739.
 
 
 28
 According to L & I's Chief of License Issuance, L & I had several unwritten policies governing dance hall licenses. In 1988, it would not accept a dance hall license application until the applicant had a certificate of occupancy. L & I referred applications to other City departments for a fire inspection, a tax confirmation, and police department approval. The police department checked to determine whether the operator had a criminal record, performed a survey to determine whether neighborhood opposition existed in the surrounding community, and made a recommendation to L & I whether to grant the dance hall license. According to the Chief of License Issuance, L & I had a 30-year old policy to adopt the recommendation of the police department upon completion of its investigation.
 
 B. TAKING WITHOUT JUST COMPENSATION
 
 29
 The Fifth Amendment, applicable here through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." It "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987). It is designed "not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." Id. at 315, 107 S.Ct. at 2385-86 (emphasis in original). Furthermore, it does not require that just compensation be paid in advance of or even contemporaneously with the taking, see Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 194, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985); rather, all that is required is the existence of a " 'reasonable, certain and adequate provision for obtaining compensation' " at the time of the taking. Blanchette v. Connecticut General Insurance Corp., 419 U.S. 102, 125, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974) (quoting Cherokee Nation v. Southern Kansas R. Co., 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295 (1890)). Thus, "if the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." Williamson County, 473 U.S. at 194-95, 105 S.Ct. at 3121 (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1013, 1018 n. 21, 104 S.Ct. 2862, 2878, 2881 n. 21, 81 L.Ed.2d 815 (1984)).
 
 
 30
 We set forth the factors to be considered in determining whether state action constitutes a taking without just compensation in Keystone Bituminous Coal Ass'n v. Duncan, 771 F.2d 707, 715 (3d Cir.1985), aff'd, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). A "taking may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 771 F.2d at 712 (quoting Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). Physical invasion, however, is not a prerequisite to a taking. See also Pinewood Estates v. Barnegat Twp. Leveling Board, 898 F.2d 347, 350-51 (3d Cir.1990). In instances in which a state "reasonably conclude[s] that the 'health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," a taking requiring compensation occurs only when a regulation that "destroyed or adversely affected recognized real property interests" reaches a certain magnitude. Keystone, 771 F.2d at 712-13. In such a circumstance, diminution in the value of the property is only one factor used to determine whether the degree of interference justifies compensation. Id. at 713. A second element is the extent that the regulation interferes with "reasonable, distinct, investment-backed expectations." Id. (citing Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659).
 
 
 31
 A taking is not established simply upon a showing of "the denial of 'the ability to exploit a property interest that [the plaintiffs] heretofore had believed was available.' " Keystone, 771 F.2d at 713 (quoting Penn Central, 438 U.S. at 130, 98 S.Ct. at 2662) (denial to use air rights to build office tower leaves other reasonable beneficial uses of site and, therefore, there is insufficient interference with investment-backed expectations). See also deBotton v. Marple Township, 689 F.Supp. 477, 481 (E.D.Pa.1988) (denial of curative amendment to zoning ordinance to construct mobile home park does not deprive owner of all uses of property because ordinance still permits construction of single family homes). But see Wheeler v. City of Pleasant Grove, 664 F.2d 99, 100 (5th Cir.1981) (confiscatory measure of revoking building permit for apartment complex is a taking), cert. denied, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982).
 
 
 32
 Temporary takings that deny the landowner all use of its property also require compensation for the period of the taking, even if the government authority amends, withdraws, or invalidates the regulation or action that caused the taking. First English, 482 U.S. at 321, 107 S.Ct. at 2389. Notably, in First English, the Court was required by the procedural posture of the case to assume that the ordinance in question denied the landowner all use of its property because the plaintiff had made that allegation and the trial court sustained the defendant's motion to strike. Id. The Court expressly limited its holding to the peculiar facts in First English and noted it did "not deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like...." Id.
 
 
 33
 We have consistently taken a narrow view of what constitutes a taking of property by regulation. In Rogin v. Bensalem Township, 616 F.2d 680, 692 (3d Cir.1980), cert. denied, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981), we held that a township's amendments to zoning laws, after it approved a developer's building plan for a 557-unit condominium complex, to reduce the allowable units per acre from 12 to four was not a taking because the amendments applied to all landowners within the affected zone and because the value of the affected property was not "reduced drastically." Id. We noted that the Supreme Court's precedents on the change in value tolerated a much larger degree of diminution than presented by the plaintiffs, who claimed a loss in value from $3,000,000 to $2,000,000 as a result of the zoning changes. Id. Specifically, we discussed the Supreme Court's decision in Goldblatt v. Hempstead, 369 U.S. 590, 592-93, 82 S.Ct. 987, 988-89, 8 L.Ed.2d 130 (1962), in which the Court held that a city ordinance that banned excavations below the water table and which prevented the claimant from continuing its 30-year old sand and gravel business was not a taking because it was a valid exercise of the police power and, although the ordinance deprived the property of its most beneficial use, the lot retained value. Rogin, 616 F.2d at 690. In Rogin we explained that the Supreme Court would uphold general land use regulations "unless application of the law destroys or severely diminishes the value of the property ... even if the legislation prohibits 'a beneficial use to which individual parcels had previously been devoted and thus cause[s] substantial individualized harm.' " Id. (emphasis added).
 
 
 34
 In Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1031 (3d Cir.), cert. denied, 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987), we held that the township's rezoning of an area from industrial to agricultural, which frustrated the plaintiff's plans to construct an industrial park, was not a taking without just compensation because the property retained a substantial value that established the existence of residual economically feasible uses. Id. We explained that although the claimant had been denied the best use or uses of the 37 acres, it had not been deprived of all economically viable uses of the property. Id. (citing Goldblatt, 369 U.S. at 592, 82 S.Ct. at 989; Penn Central, 438 U.S. at 131, 98 S.Ct. at 2663; Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114 (1926) (75 percent diminution in value); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (reduction in value from $800,000 to $60,000)).
 
 
 35
 We are satisfied that, in light of these precedents, the appellees could not and did not establish that the denial of the dance hall licenses constituted a taking. The licenses were, of course, not themselves taken as they were simply not issued. Furthermore, there is no basis in the record from which it could be concluded that the alleged diminution in the value of the properties deprived appellees of all economically viable uses of them. The denial of the dance hall license to After Midnight did not preclude the use of the Spring Garden Street property as an arcade, restaurant, roller rink, and movie theater. While the alternative uses of Down South's South Street property are not so clear, it is evident that, as we have already described, it was in violation of important fire code sections and did not have a certificate of occupancy for its premises when its dance hall application was denied. In the circumstances, we do not understand how it could have been deprived of its property when denied the dance hall license, as it could not have used the property for a dance hall even if it had the license. It is even more significant that inasmuch as the property was not in conformity with these regulations, the dance hall license could not have been lawfully issued. In any event, if Down South met the safety requirements and obtained a certificate of occupancy it could have used its property for other lawful purposes.
 
 
 36
 On the motions for summary judgment, the district court focused its analysis on appellees' investment-backed expectations rather than the value of the property, stating:
 
 
 37
 Plaintiffs are entitled to a remedy for 'reasonable, distinct, investment backed expectations' which may involve a recognition of the fact that a property can have value arising from partially executed plans for development, that is unique to its owners and not reflected [in] its current market value. One of the two limiting principles based on [Pace Resources ] is that even where distinct, investment-backed expectations are involved, a taking through an exercise of the police power occurs only when the regulation 'has nearly the same effect as the complete destruction of the property rights of the owner.'
 
 
 38
 App. at 144-45 (citations omitted).
 
 
 39
 It distinguished this case from ones in which the plaintiff was denied a building permit because in those cases, unlike this one, the plaintiffs were not required to invest large sums before their expectations were frustrated. Id. (citing Bello v. Walker, 840 F.2d 1124 (3d Cir.), cert. denied, 488 U.S. 851 & 868, 109 S.Ct. 134 & 176, 102 L.Ed.2d 107 & 145 (1988)). This distinction, however, cannot be reconciled with the Supreme Court's holding in Goldblatt, for there the plaintiff had been operating its business for 30 years and had obviously invested great sums before its expectations of continued business were frustrated. The district court's artificial distinction allowed it to avoid the two factors we set forth in Pace Resources that limit recognition of a property's value arising from partially executed plans for development:
 
 
 40
 First, distinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest. Second, even where distinct, investment-backed expectations are involved, a taking through an exercise of the police power occurs only when the regulation 'has nearly the same effect as the complete destruction of [the property] rights' of the owner.
 
 
 41
 808 F.2d at 1033 (emphasis added).
 
 
 42
 Considering these principles, in Pace Resources we held that the landowner did not have a reasonable expectation that it would be entitled to use its property in accordance with its original plan in light of "the legitimate interest of municipalities in being able to modify land use planning rules when they perceived the need for change." Id. The mere existence of investment-backed expectations, therefore, is not determinative in the inquiry of whether a taking occurred. In fact, the plaintiff in Pace Resources presented evidence that it invested $142,000 in road construction, utility improvements, and engineering costs.
 
 
 43
 We thus conclude that the district court should have granted the City's motion for summary judgment on the issue of a taking of property without just compensation and should later have granted it a judgment notwithstanding the verdict on the issue. Certainly, the appellees were operating in a known area of state regulation in light of the Dance Hall Act. They decided to invest the funds to construct dance halls although the statute clearly stated that a dance hall license was not available until a site conformed with the relevant laws, regulations, and ordinances and was determined to be safe and proper for the purpose. While appellees' expectations of dance hall licenses and profits are investment-backed, they cannot be reasonable in light of the City's explicit power to regulate dance halls. Additionally, the denial of the dance hall licenses did not destroy the value of the properties; rather, at most it eliminated one possible use of them. Appellees, therefore, were not denied all economically feasible uses of the properties. Pace Resources, 808 F.2d at 1031. We conclude that denial of the dance hall licenses could not have nearly the same effect as the complete destruction of the property rights of the owner. Id. at 1033. In the circumstances we will reverse the order of February 11, 1991, on this taking of property point and will remand for entry of judgment for the City.
 
 C. PROCEDURAL DUE PROCESS
 
 44
 For the appellees to recover for the alleged procedural due process violations the City must have infringed a property interest encompassed by the Fourteenth Amendment.[7] For these purposes, however, property interests are defined somewhat differently than they are for taking purposes for here we focus on what the appellees sought from the City, dance hall licenses, rather than the use of property they already had. A property interest subject to protection by the due process clause results from a "legitimate claim of entitlement" created by an independent source such as state law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). We have held that an entitlement may exist for a benefit sought but not yet obtained if state law limits the exercise of discretion by the state official responsible for conferring the benefit. Winsett, 617 F.2d at 1007.
 
 
 45
 The district court concluded on motions for summary judgment that the appellees asserted a property interest in the dance hall licenses, relying on its earlier opinion in Second & Ashbourne Associates v. Cheltenham Township, No. 88-6400, 1989 WL 86602 (E.D.Pa. July 28, 1989) in which it indicated that a party seeking approval of a development plan who satisfies all the objective criteria for approval is entitled to approval under Pennsylvania common law. But the scheme for approval of the development plan in Second & Ashbourne was markedly different from licensing under the Dance Hall Act.
 
 
 46
 Under the Dance Hall Act, the City is required to investigate whether the facility complies with the rules, regulations, ordinances, and laws applicable to dance halls. Pa.Stat.Ann. tit. 53, § 4735. The Act precludes issuance of a license until it has been ascertained that the facility complies with "all laws, ordinances, health and fire regulations, applicable thereto, and is a safe and proper place for the purpose for which it shall be used." Id. § 4736 (emphasis added). Accordingly, the plain language of the statute requires consideration of factors other than compliance with laws, regulations, and ordinances and distinguishes this case from Second & Ashbourne. The district court's determination that satisfaction of these "objective requirements" sufficed to create a property interest was tantamount to eliminating from the statute the discretionary element of whether it is a safe and proper place. But the "safe and proper" language makes it plain that the City retains discretion to determine the safety and propriety of the operation, whether the term "place" refers to the facility or its location.
 
 
 47
 We think it evident that the City could conclude that a dance hall would not be at a proper place if it would substantially disrupt a neighborhood, as the Review Board found had happened in the case of After Midnight. This broad discretion precludes a finding that an applicant has a "legitimate claim of entitlement" in a dance hall license for procedural due process purposes and accordingly appellees could not prevail on this claim.[8] Thus, the district court's instruction to the jury that "[p]laintiffs have a property right in approval of their dance license if they have met all of the objective criteria set forth in the city's ordinances, laws or regulations required for approval of such plans" misstated the law. In effect, therefore, this federal court constitutional litigation was used as a substitute for state court proceedings in which a broader scope of review of the administrative actions might be available, a review not dependent upon an applicant's establishing that it had a property interest for Fourteenth Amendment purposes.
 
 
 48
 Our approach in this matter to determine whether there is a claim of entitlement is not unique. In Bateson v. Geisse, 857 F.2d 1300, 1305 (9th Cir.1988), the municipality and public officials in a dispute with a developer were sued for, among other things, denying the developer procedural due process in denying him approval of a minor plat. The district court ruled for the defendants on this point and the plaintiff appealed. The Court of Appeals affirmed, holding that the plaintiff did not have a protected property interest in the minor plat application because "of the lack of any significant substantive restrictions on the City Council's powers" so that the matter was left to the "unbrided discretion" of the agency. That is essentially the situation here for, in addition to the objective requirement that applicable laws, ordinances and regulations be satisfied, the license could not be issued unless the facility was a "safe and proper place" for the dances.[9] We hold that this vague standard precludes a conclusion that appellees had protected property interests in the license applications for procedural due process purposes.
 
 
 49
 Analyses similar to that in Bateson were undertaken in the following cases: Littlefield v. City of Afton, 785 F.2d 596, 601-02 (8th Cir.1986) (under Minnesota law, applicant entitled to building permit upon compliance with applicable laws and codes because municipality has no discretion to deny it); Scott v. Greenville County, 716 F.2d 1409, 1418 (4th Cir.1983) (builder has protected property interest in building permit merely upon presentation of application and plans showing a use permitted under zoning ordinance under South Carolina law); Reed v. Village of Shorewood, 704 F.2d 943, 948-49 (7th Cir.1983) (undemanding standards for renewal of liquor license create property interest under Illinois law). While different results were reached in these cases than we reach here, that was because the local law was different and justified a claim of entitlement. But we are informed by their method of analysis.
 
 
 50
 Assuming that the appellees had protected property interests in dance hall licenses, they were not denied procedural due process under the dance hall licensing procedure. To establish a cause of action for a violation of procedural due process, a plaintiff in addition to proving that a person acting under color of state law deprived it of a protected property interest, must establish that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process. Parratt v. Taylor, 451 U.S. 527, 537, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981). Due process requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case," Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), and the opportunity to be heard must be at a meaningful time and in a meaningful manner. Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). However, when a state "affords a full judicial mechanism with which to challenge the administrative decision to deny an application for a building permit," the state provides adequate due process. Bello v. Walker, 840 F.2d at 1128.
 
 
 51
 In fact, we have rejected claims of procedural due process violation for administrative schemes remarkably similar to that here. In Rogin, we upheld Pennsylvania's scheme for challenging zoning ordinances, which provided for a ministerial review of a proposed use by the Zoning Officer, appeal to the Zoning Hearing Board, and appeal of that decision to the Court of Common Pleas. Rogin, 616 F.2d at 694-95. The Zoning Hearing Board was required to provide a hearing; to give notice to the public, the zoning officer, and appellant; and to make findings and to render a decision on the merits. At the hearing, parties could present evidence and cross-examine witnesses. The Board could compel appearances and production of documents. As here, the scheme did not set forth specific standards that the Zoning Hearing Board must consider.
 
 
 52
 Likewise, in Bello v. Walker, 840 F.2d at 1128, we rejected a procedural due process challenge to Pennsylvania's scheme governing applications for building permits. The availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that was wrongly denied, precluded a determination that the decision was made pursuant to a constitutionally defective procedure. Id.
 
 
 53
 The procedure available to the appellees provides that, upon application, L & I has the power and the duty to "[d]etermine whether the applicant is properly entitled to the license which he seeks." Home Rule Charter § 5-1002(b). If the applicant is refused, L & I "shall ... notify the applicant in writing of the refusal and the reasons therefor." Id. L & I is required to establish the requirements and standards for all licenses unless the charter provides that another department, such as the Department of Public Health, is responsible for that function "because that department has an appreciation and a comprehension of the reasons why a license is required to a degree not possible to be had by [L & I]." Id. § 5-1002(c) & annotation 3. "Standards to be met upon inspection are to be determined by the departments primarily responsible for the functions involved because they will be peculiarly competent to appraise and determine what shall constitute conformance with laws and regulations within the sphere of their functions." Id. annotation 5. L & I must forward a copy of the application, as well as other pertinent information, to the appropriate department. Id. § 5-1003.
 
 
 54
 The City's Home Rule Charter provides an appeal procedure by which an aggrieved party may obtain review of L & I action. Upon request, L & I must furnish a written statement of the reasons for the action taken. The Review Board must provide a hearing at which both sides may present evidence and must "make findings and render a decision in writing." Id. § 5-1005. Its decision is binding on the City's administrative agencies. An aggrieved party may challenge final local agency action in state court. 2 Pa.Cons.Stat.Ann. §§ 751-752 (Purdon Supp.1991). This scheme satisfies the requirements of procedural due process. See Bello, 840 F.2d at 1128.
 
 
 55
 Appellees nevertheless contend that the licensing scheme violates procedural due process because the City did not provide notice of the risk that the license might be denied before requiring them to spend substantial sums and the procedure does not give notice that neighborhood approval will be considered as grounds for denying the license. Both claims are without merit.
 
 
 56
 First, the statute clearly states that no dance hall license will be issued until the facility complies with all laws, ordinances, and regulations. Thus, the risk that the license might not be granted until the applicant spends money to bring the facility into line is clear from the language of the statute. Furthermore, we cannot understand how appellees could have thought that they had to be given a license simply because they renovated their facilities for, as we have explained, the Dance Hall Act has licensing criteria independent of the condition of the premises. We also point out that both After Midnight and Down South failed to pursue all available remedies, After Midnight by withdrawing its first Common Pleas action and Down South by not pursuing its appeal to the Review Board. But the procedure itself was not inadequate.
 
 
 57
 Second, to support their contention that the failure to give notice of the criteria the City employs to evaluate dance hall license applications, plaintiffs rely on McCollum v. City of Powder Springs, 720 F.Supp. 985, 989 (N.D.Ga.1989), in which the court reasoned that an ordinance that granted unfettered discretion in the local authority to grant wine and beer licenses to facilities within 300 feet of a residence violated due process because it did not provide notice to applicants that the authority would consider "the general welfare of the community." We will not follow McCollum. We believe that the City may consider interests in matters inherently part of its police power, such as safety and welfare of the community, without violating procedural due process, particularly in the light of the "safe and proper" requirement for licensing.
 
 
 58
 The district court denied summary judgment, stating only that the availability of automatic appeal to the Review Board did not establish as a matter of law that the procedure was constitutional, and submitted the following question to the jury:
 
 
 59
 If you find that plaintiffs were deprived of the opportunity to be heard in a meaningful manner, because plaintiffs were not put on notice that they would have to satisfy neighborhood objections, then you may find that plaintiffs' procedural due process rights were violated.
 
 
 60
 But a court, not a jury, should decide whether the licensing scheme satisfied procedural due process. Assuming appellees had protected property interests in the dance hall licenses, the jury question would be whether the City violated the prescribed procedure in denying the licenses.
 
 
 61
 This procedural scheme provided due process. The denials of the license gave the reasons for denial and set forth the right to appeal. Midnight Sessions appealed to the Review Board and Court of Common Pleas, but withdrew the court proceeding and then requested rehearing from the Board. It ultimately received its dance hall license, albeit later than it expected. But delay alone does not create a procedural due process violation. See Bello v. Walker, 840 F.2d at 1127-28 (reasonable remedies for rectification of agency error provide adequate due process). While Down South did not pursue its appeal its failure to do so does not mean that it was denied procedural due process. We can hardly excuse a party from perfecting an administrative appeal because of its financial condition and thereby permit a finding that procedural due process has been denied, particularly where, as here, the administrative appeal procedure was so easily invoked and completed.[10]
 
 
 62
 In sum, we conclude that After Midnight and Down South did not have protected property interests in dance hall licenses and, even if they did, the City's licensing procedure did not violate the requirements of procedural due process. Thus, the City should have been granted summary judgment on the procedural due process claims and its motion for judgment notwithstanding the verdict should have been granted on them. We will therefore reverse the order of February 11, 1991, on this point and will remand for entry of judgment for the City.
 
 D. SUBSTANTIVE DUE PROCESS
 
 63
 The final basis for the jury's verdict was its finding that the City denied the appellees substantive due process of law. The test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate government interest. Rogin v. Bensalem Township, 616 F.2d at 689.[11] " '[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.' " Id. (quoting Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955)). Determination of whether a legislative scheme is rationally related to a legitimate government interest is a question of law for the court to determine. See Rogin, 616 F.2d at 689-90. Federal courts, however, will largely defer to legislative judgments rather than substitute their own judgment in cases involving land use policy because they will not "undermine the legitimacy of democratic decisionmaking unless the local legislative judgment is without a plausible rational basis." Pace Resources, 808 F.2d at 1035.
 
 
 64
 We have recognized that, notwithstanding a constitutionally procedurally adequate scheme, a plaintiff may maintain a claim of substantive due process violation upon allegations that the government deliberately and arbitrarily abused its power. Bello, 840 F.2d at 1129. Thus, allegations that the government's actions in a particular case were motivated by bias, bad faith, or improper motive, such as partisan political reasons or personal reasons unrelated to the merits of the plaintiffs' application, may support a finding of substantive due process violation. Id. See also Pace Resources, 808 F.2d at 1035 (irrationality not shown where complaint did not allege government actions toward developer unrelated to land use planning). Additionally, the Court of Appeals for the First Circuit has stated that a government's action may violate substantive due process if the plaintiff could show a "fundamental procedural irregularity, racial animus, or the like." Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir.), cert. denied, 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982). Clearly in disputed factual situations, determinations of the existence of bias, bad faith, improper motive, racial animus, or the existence of partisan political or personal reasons are properly made by the finder of fact. Bello, 840 F.2d at 1130; deBotton v. Marple Township, 689 F.Supp. at 481.
 
 
 65
 But we conclude that the district court erroneously asked the jury to resolve a legal rather than a factual question. In its charge to the jury, the district court stated:
 
 
 66
 The test of whether the City violated Plaintiffs' substantive due process rights is whether the City lacked any rational basis for the denial of the dance license. The exercise of the City's authority needs only to bear a rational relationship to a legitimate government objective. Inadvertent errors, honest mistakes, agency confusion, or even negligence in the performance of official duties do not rise to a violation of substantive due process. Thus, the denial must be arbitrary and capricious with no conceivable rational factual basis for there to be any violation of substantive due process. It is for you, the jury, to determine whether there existed any rational factual basis for the denial of the approvals. (Emphasis added).
 
 
 67
 But, whether the challenged scheme is rationally related to a legitimate government interest and whether, in this particular case, the City acted arbitrarily and irrationally because it had an improper motive are distinct questions that the district court obfuscated in this instruction. Certainly, a jury is ill-equipped to determine whether the licensing scheme, by which L & I delegated investigation of the application to the police department, was rationally related to a legitimate government interest inasmuch as such interests are defined by law. Likewise, the "rational relationship" test is a legal standard applied by the court, not a factual determination rendered by a jury. The only question appropriate for jury resolution, therefore, was whether the City denied the applications due to some improper motive such as political motivation or racial animus. Because we are unable to determine from the jury verdict whether it concluded that (1) the City's scheme was not rationally related to a legitimate government interest, or (2) the City's actions in denying the application were improperly motivated,[12] we will reverse the judgment in favor of After Midnight to the extent that it was predicated on a finding of a violation of substantive due process and will remand for a new trial on that issue.
 
 
 68
 Whether the City's consideration of community objection was appropriate in the first instance is a question of law for the court to determine. The proper analysis should have been (1) a legal determination whether the City could properly rely on police department approval and neighborhood objection in licensing decisions and, therefore, whether its licensing scheme was rationally related to a governmental interest, Rogin, 616 F.2d at 689; Pace, 808 F.2d at 1035, and (2) a factual determination whether the City acted with improper motive here and, therefore, whether its action in denying the applications was arbitrary and irrational, Marks v. City of Chesapeake, 883 F.2d 308, 312 (4th Cir.1989) (fact finder's only task was to resolve dispute over government's "true motivation" for acting); Bello, 840 F.2d at 1130.[13]
 
 
 69
 To the extent that legal issues are involved we will decide them rather than remanding for that purpose. We conclude that the City's delegation to the police department for its recommendation was rationally related to a legitimate government interest. The police department performs the investigative functions of determining whether the facility is a "safe and proper place for the purpose for which it shall be used" and that department may be considered expert in public safety matters. Even though this delegation of authority by L & I arguably violates the Home Rule Charter which suggests that departments may not delegate license approvals, a violation of state law in itself does not constitute a denial of substantive due process. Certainly, the delegation of the investigatory function to the police department is not arbitrary or irrational and federal courts do not sit in federal question cases to grant remedies for mere violations of state law.[14]
 
 
 70
 The rationality of a municipality's consideration of community sentiment for determining property use issues is less clear. The United States Supreme Court has held that consideration of community sentiment is not rationally related to any legitimate government objective if that sentiment is based on "negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a [land use] proceeding...." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 448, 105 S.Ct. 3249, 3258-59, 87 L.Ed.2d 313 (1985). See also Sullivan v. City of Pittsburgh, 620 F.Supp. 935, 946 (W.D.Pa.1985), aff'd, 811 F.2d 171 (3d Cir.), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); Marks, 883 F.2d at 312. Likewise, statutes have been struck down that permit certain land uses only upon approval of nearby property owners as violative of substantive due process if the statute does not provide standards to guide the property owners' decision and they, therefore, could withhold approval for entirely arbitrary reasons. See Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 121-22, 49 S.Ct. 50, 52, 73 L.Ed. 210 (1928) (zoning ordinance that permitted erection of philanthropic home upon written consent of two-thirds of owners of property within 400 feet of site not justified by state's police power and violates due process where owners' decision not constrained by any legislative standards nor subject to review, though the Court suggested that a different result might have been reached if the proposed use was likely to be a nuisance or annoyance); Eubank v. City of Richmond, 226 U.S. 137, 143-44, 33 S.Ct. 76, 77, 57 L.Ed. 156 (1912) (ordinance permitting two-thirds of owners of property on street to petition for building line is unreasonable exercise of police power that violates due process because it inappropriately permits those owners to determine extent and kind of use of another's property without standards governing exercise of this power).
 
 
 71
 Consideration of public sentiment, however, is not a per se substantive due process violation. Recently, the Court of Appeals for the Fourth Circuit struck down a West Virginia statute that permitted the Director of the state's Department of Natural Resources to deny a landfill permit if the facility "is significantly adverse to the public sentiment [in] the area" because the statute did not provide any meaningful standard by which the Director could measure adverse sentiment to determine whether opposition was based on impermissible expressions of self-interest, bias, or ignorance or whether it was based on permissible state concerns. Geo-Tech Reclamation Industries, Inc. v. Hamrick, 886 F.2d 662, 663, 666 (4th Cir.1989). Notably, the court did not reject the state's consideration of public sentiment that was based on factors that were permissible state concerns. In addition to the obvious state concerns of the effects of increased traffic, noise, odors, the court recognized that the state had a legitimate interest in the facility's intangible effects such as the possibility of decreased community pride and fractured community spirit. The court concluded that the Director's deference to the unreflective and unreasoned public sentiment that "a dump is still a dump" was not rationally related to the otherwise legitimate public goal of protecting community pride and spirit. Id. at 666.
 
 
 72
 We agree with the Court of Appeals for the Fourth Circuit that the state may consider community sentiment in evaluating applications for licenses if community objection is based on legitimate state interests such as, inter alia, traffic, safety, crime, community pride, or noise. A community's feelings need not be ignored when a massive entertainment facility such as After Midnight is thrust into it with the evident potential for disruption. On the other hand a government's determination predicated on the public's negative attitudes or biases, unfounded fears or speculation, prejudice, self-interest, or ignorance is arbitrary and irrational action that the due process clause proscribes.[15] But, again, consideration of the community's viewpoint about the local effects of a proposed change in their neighborhood that has some basis in fact cannot fairly be characterized as arbitrary and capricious government action. We decline to equate the accommodation of legitimate community concerns to a victory of mob rule to be denounced under substantive due process standards.
 
 
 73
 We recognize that the appellees' contention that consideration of community sentiment is a per se violation of substantive due process finds support in McCollum v. City of Powder Springs, 720 F.Supp. at 985. In McCollum, the district court, relying on a Georgia Supreme Court case, held that granting or denying applications based on public opposition is an unconstitutional due process and equal protection violation. McCollum, 720 F.Supp. at 989 (relying on Bozik v. Cobb County, 240 Ga. 537, 242 S.E.2d 48 (1978)). But, we believe that the McCollum court's holding is not applicable here as there is no indication in that opinion that the public opposition was reflective of the legitimate concerns reflected in this case. Surely, the state's consideration of public sentiment that reflects legitimate state concerns and has adequate factual basis is not per se arbitrary and irrational.
 
 
 74
 The appropriate consideration for the jury, therefore, was whether the police in their recommendation knowingly relied on unsubstantiated or irrational community objections, based on an improper motive, rather than some legitimate concerns such as traffic congestion, road safety, public safety, crime and noise and therefore whether or not the license was denied by the City on an improper basis. The record reflects that a material fact may remain in dispute as to the neighbors' and police department's motivation and thus we cannot say that the City was entitled to a judgment notwithstanding the verdict on the point. But because of the errors we have identified it must be given a new trial and, accordingly, we will reverse the order of February 11, 1991, denying a new trial on this point and will remand the case for a new trial on the substantive due process claim of After Midnight.[16]
 
 
 75
 Down South's claim that the City arbitrarily and irrationally enforced fire and building regulations to drive it out of business confronts a different obstacle; its substantive due process challenge never ripened for this portion of its claim. In Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. at 200, 105 S.Ct. at 3123, the Supreme Court, employing a substantive due process analysis, held that the respondent's claim that a regulation was an invalid exercise of the police power was premature because it failed to seek variances from certain zoning ordinances and subdivision regulations and, thus, there had not been a final decision on the application of those ordinances and regulation to respondent's property. The Court explained that resolution of the question of whether the regulation had "gone too far" so as to constitute an invalid exercise of police power depended on its effect on the value of respondent's property and investment-backed profit expectations. Id. The Court recognized that exhaustion of administrative remedies was not required for a suit to be brought under 42 U.S.C. § 1983, 473 U.S. at 192, 105 S.Ct. at 3119 (citing Patsy v. Florida Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)), but stated:
 
 
 76
 The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable.
 
 
 77
 473 U.S. at 192, 105 S.Ct. at 3119.
 
 
 78
 The Court explained that the exhaustion requirement referred to procedures by which an injured party could seek review and obtain a remedy if the administrative decision was unlawful or otherwise inappropriate. Id. at 193, 105 S.Ct. at 3120.
 
 
 79
 Down South did not appeal to the Review Board the citations for violations it received from L & I nor the denial of the certificate of occupancy. This failure to appeal precludes "final administrative action" by the City and, therefore, these claims were premature and should have been dismissed on summary judgment. Federal litigation of this kind is not intended to be a substitute for carefully constructed state procedures.[17]
 
 
 80
 Furthermore, we do not understand how Down South can possibly have a valid substantive due process claim by reason of the denial of its dance hall license for when the license was denied Down South's premises were not in compliance with the applicable laws, ordinances and fire regulations and could not have been lawfully occupied. Indeed, it would have been improper to grant it the license at the time that L & I acted on the application so the denial of the application was not arbitrary and capricious. Thus, the motion for summary judgment and for judgment notwithstanding the verdict should have been granted to the City on Down South's substantive due process claims. Therefore we will reverse the order of February 11, 1991, on this point and will remand for entry of judgment for the City.
 
 E. RICO and COUNCILMAN TAYOUN
 
 81
 We have carefully considered the complaint on the RICO count against Tayoun and have determined that it did not adequately charge racketeering activity as defined in RICO. In addition, we have concluded that the district court did not abuse its discretion in not permitting its amendment. Accordingly, we will affirm the order of July 24, 1990, dismissing the action as to him.
 
 III. CONCLUSION
 
 82
 We decide that the district court erred when it denied the City's motions for summary judgment and judgment notwithstanding the verdict on the issues of taking without just compensation and procedural due process as to all of the appellees. We will therefore reverse the order of February 11, 1991, denying the motion for a judgment notwithstanding the verdict on these issues and will remand for the district court to enter judgment for the City on them. We have also concluded that the City is entitled to judgment in its favor on the claims of Down South for denial of substantive due process and thus we will reverse the order of February 11, 1991, and will remand for entry of judgment in favor of the City on that issue. While we do not conclude that the City was entitled to judgment in its favor on the substantive due process claim of After Midnight, we are satisfied that there must be a new trial on that issue and we will therefore reverse the order of February 11, 1991, to the extent that it denied a new trial on that claim. The new trial will also include the damages issue as we are not certain that it is so distinct and separate from the liability issue that a new trial may be held on the substantive due process contentions without injustice.[18] See Childers v. Joseph, 842 F.2d 689, 699 (3d Cir.1988). In this regard we point out that while there was only a single damage award in favor of After Midnight, there were three bases of liability for it, two of which are now eliminated.[19] In view of our result the order of January 14, 1991, awarding attorneys' fees against the City will be vacated. Finally, we will affirm the order of dismissal of July 24, 1990, in favor of Councilman Tayoun.
 
 
 
 *
 The Honorable James F. McClure, Jr., United States District Judge for the Middle District of Pennsylvania, sitting by designation
 
 
 [1]
 Subject matter jurisdiction in the district court was predicated on 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. We are exercising plenary review as we are deciding the case through the application of legal precepts
 
 
 [2]
 This was apparently because of Pa.Stat.Ann. tit. 53, § 4737 (Purdon 1972) which provides that if a license is forfeited or revoked at least three months shall elapse before another license may be granted for the premises
 
 
 [3]
 The district court indicated that it was "undisputed that the plaintiffs' dance hall" was in compliance with the objective criteria. While the opinion is not clear on this point, this observation must have been limited to After Midnight as Down South was not in such compliance
 
 
 [4]
 They seem not to have opposed the City's motion for dismissal of this claim in the district court
 
 
 [5]
 We will not describe the reasons why the claims against the other defendants were dismissed as they are not parties to this appeal
 
 
 [6]
 Motions for directed verdicts were denied at trial
 
 
 [7]
 We are not concerned with a liberty interest here
 
 
 [8]
 The parties do not cite any Pennsylvania case which defines the scope of the City's authority under the Dance Hall Act and we are not aware of any precedent limiting the discretionary aspects of licensing under the Act. While Fantastic Plastic, Inc. v. Flaherty, 26 Pa.Commw. 11, 361 A.2d 489 (1976), does deal with the statute, it is not apposite because it did not address the City's substantive powers under the Act
 
 
 [9]
 The appellees in their brief characterize the "safe and proper" language as "nebulous." That, of course, is our point
 
 
 [10]
 The appeals to the Review Board are filed on very informal documents and are quickly heard. Thus, After Midnight's initial appeal was heard and decided 11 days after L & I denied it the license
 
 
 [11]
 The City does not contend that the appellees' lack of property interests for procedural due process purposes bars their substantive due process claims as it seems to assume that they were entitled to substantive due process in the consideration of their applications but urges that they received it. Thus, we do not address that possibility. Rather, we will assume, without deciding, that the appellees were entitled to substantive due process in the consideration of their applications
 
 
 [12]
 We note that the jury rejected appellees' contention that the City's actions were the result of intentional race discrimination
 
 
 [13]
 The appellees contend that the City did not object to the charge. But the issue is not the charge as such. Rather, the City asked the court to decide legal matters and its appeal is thus directed to the failure of the court to make these decisions rather than its directions to the jury for guidance in decisions which were the jury's to make
 
 
 [14]
 This principle is demonstrated by Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d at 1023, in which a developer obtained relief on state grounds in a state court from a rezoning ordinance but was unsuccessful in its quest for damages in federal court taking and due process litigation. See also Creative Environments, Inc. v. Estabrook, 680 F.2d at 833
 
 
 [15]
 We note that Browning-Ferris Industries v. City of Maryland Heights, 747 F.Supp. 1340, 1349 (E.D.Mo.1990), is not inconsistent with our conclusion that consideration of community sentiment is not a per se violation of substantive due process. In Browning-Ferris, the court held that the city's denial of Browning-Ferris's landfill license was arbitrary and capricious because it relied on public sentiment, specifically the clamorous testimony of business owners located adjacent to the facility, that was contrary to the substantial weight of the scientific and technical evidence supporting continued operation of the landfill. Id. at 1349. The Browning-Ferris court did not discuss the substance of the business owners' complaints and thus did not weigh the validity of these complaints against the technical evidence
 
 
 [16]
 We point out that the jury returned a verdict that the City was not liable for racial discrimination. As we do not disturb this finding, the appellees not having cross-appealed on this point, it may have preclusive effect at the retrial but we do not address that point which has not been briefed. We also observe that while we are remanding for a new trial on this issue we are not foreclosing the City from moving for summary judgment on the substantive due process claim of After Midnight. In this regard we observe that the record in the district court was not developed in the light of the principles we are setting forth so that it is possible that upon further development the record may demonstrate that there is no dispute of fact which should now be deemed material
 
 
 [17]
 The City does not contend that After Midnight's claims were premature. It does, however, make the related argument that After Midnight waived its substantive due process objections by not pursuing them in the administrative proceedings. We disagree as we are satisfied that even if we assumed that the appellees could in some circumstances be held to have waived this claim here they did not. They did, after all, make two applications to L & I for a license for After Midnight following which they twice appealed to the Review Board and twice filed Common Pleas actions
 
 
 [18]
 The damage verdict in favor of After Midnight far exceeded its actual losses for expenses and apparently was predicated on lost profits. The City urges that the evidence of lost profits was speculative and we observe that following its licensing After Midnight ultimately went out of business. While we are not ruling on the admissibility of this evidence at this time, we do bring the attention of the district court to the principles set forth in Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 680-82 (3d Cir.1991), which was decided after the trial in this case
 
 
 [19]
 The district court instructed the jury on damages that if it found the City liable on more than one basis but the appellees suffered only the same injury for each wrong that they would have suffered from a single violation, damages should not be greater than those flowing from the single injury. On the other hand, if it found separate injuries from separate violations the appellees were entitled to just compensation for all the injuries. In view of the circumstance that there were three separate bases for liability but lump sum damage awards, we cannot know what damages, if any, the jury found for After Midnight on the substantive due process violation alone