**TRINITY RESOURCES, INC.; Trinity Fellowship Church of South Jersey; Rev. Abraham E. Fenton; Eve Lynne E. Fenton; Rev. Richard W. Minus; Plaintiffs,**

v.

**TWP. OF DELANCO; Robert Bellan; Twp. of Delanco Committee; Edward Schaefer; Clarence Hubbs; Twp. of Delanco Planning Board; Twp. of Delanco Zoning Board; Twp. of Delanco Tax Assessor and Collector; Defendants.**

Civ. A. No. 93–5197 (MLP).

United States District Court,
D. New Jersey.

Feb. 10, 1994.

---

14. *See* footnote 11, *supra*.

Alicia E. Fenton, Pepper, Hamilton & Scheetz, Westmont, NJ, for plaintiffs.

Nicholas J. Costa, Costa & Vetra, Mount Laurel, NJ, for defendants.

## OPINION

PARELL, District Judge.

## I. THE PROCEEDINGS

Plaintiffs are Trinity Resources, Inc., ("the Corporation"), a New Jersey for-profit corporation having its principal place of business in Delanco Township, New Jersey; Trinity Fellowship Church ("the Church"), a New Jersey non-profit corporation [IRS § 501(c)(3)]; Rev. Abraham E. Fenton who is President of the Corporation and Senior Minister of the Church; Eve Lynne R. Fenton, who is Vice–President of the Corporation and Administrator of the Church; and Richard W. Minus who is Minister of Pastoral Care for the Church.

Defendants are the Township of Delanco, New Jersey ("the Township"); the Township Committee; Robert Bellan who is the Mayor of the Township; Township Committee members Joan Hinkle and Linda Lewis; the Planning Board of the Township; the Zoning Board of the Township; Owen Brennan who is the Township Zoning Officer; and Edward Schaefer and Clarence Hubbs, who are respectively the current and former Construction Code Official for the Township; the Township Tax Collection Department; and Donn Lamon, who is the Township Tax Collector.[1]

Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1985, asserting deprivation of their rights under the First, Ninth and Fourteenth Amendments to the U.S. Constitution arising out of official actions taken by defendants with respect to plaintiffs' use of property owned by the Corporation which is located partially within the Township and which is known as Holiday Lakes. By Verified Complaint filed on November 22, 1993, plaintiffs seek damages, declaratory judg-

---

1. Plaintiffs and defendants are referred to collectively herein, except where specific reference is required and thus indicated.

ment and related relief under various constitutional principles.[2] Their basic grievance is that they have been and are being deprived of their religious rights by defendants, acting under color of state and local laws.

The Verified Complaint was filed with an application for temporary restraining order or preliminary injunction.[3] By Order entered November 24, 1993, Hon. Anne E. Thompson [temporarily assigned] denied the motion for temporary restraints and set the matter down for preliminary injunction hearing. That hearing was conducted before the undersigned on December 8, 15, 28, 1993 and January 4, 1994. The record consisted of the exhibits attached to the Verified Complaint; ("Complaint Exhibits") the exhibits attached to a Certification of defense counsel Nicholas J. Costa dated December 2, 1993 ("Costa Certification Exhibits"); exhibits received in evidence for purposes of the injunctive application ("Hearing Exhibits"); and the testimony of witnesses presented by the respective parties.[4]

The Court hereby issues its findings of fact and conclusions of law, as required under Fed.R.Civ.P. 52(a). For the reasons stated, the application for preliminary injunction is denied at this time, and the action is administratively stayed on motion of the Court *sua sponte.*

## II. FINDINGS OF FACT
### A. BACKGROUND

The Township of Delanco ("the Township") is an incorporated municipality of approximately 2 square miles with a population of 3,300, located in Burlington County, New Jersey. In November, 1987, the plaintiff Corporation purchased a property of approximately 60 acres ("the property") lying partially within the Township and partially within two neighboring municipalities. The property, known as Holiday Lakes, is located in the C Commercial District zone of the Township, and for many years had been operated by the previous owner(s) as an outdoor recreational facility available to the paying public pursuant to an annually-renewed mercantile license issued by the Township.

At the time of purchase by plaintiffs, the property had two lakes, some cabanas and other small structures, two golf courses, a retail shop selling ice cream, a larger building variously referred to as a snack bar or concession facility, and large areas available for parking and outdoor activities such as picnics.[5] It had typically been made available for a fee to groups such as families, clubs and churches holding reunions and other recreational outings which sometimes included religious services. After plaintiffs purchased the property in late 1987, they applied for and received from the Township Committee in June 1988 an annual mercantile license similar to the ones previously issued (Hearing Exhibit P–1). That license, containing certain limitations and conditions, was reissued in the following two years of 1989 and 1990 (Hearing Exhibit P–2). Testimony was presented that during the summers of 1988 and 1989, and until July of 1990, plaintiffs operated the property as a recreational facility open to the public in essentially the same manner as it had been operated under the previous owners (Hearing Exhibit P–14). Extensive storm damage to outdoor

---

2. The counts of the Verified Complaint are summarized below at footnote 23.

3. The primary items of requested injunctive relief are set forth *infra* part III.B.

4. Testifying on behalf of plaintiffs were plaintiffs Abraham E. Fenton and Eve Lynne R. Fenton; also Greer Raymond, a dedicated member of the congregation; Richard Roberts, a church member and an employee of both the Church and the Corporation; and John Grandowicz, an independent electrical contractor. Testifying on behalf of defendants were Roseann Lameiras, Township Administrator; George Secalis, a sergeant of the Township Police Department; and defendant Edward Schaefer, Township Construction Official. Township Attorney Nicholas J. Costa appeared on behalf of all defendants at the hearing, but placed on the record that such appearance was limited to the initial pleadings and hearing, and that various of the public entities anticipated the need to retain separate counsel early in the case in order to avoid conflicts.

5. All references to the property in this Memorandum are to the Delanco portion of the property, except as otherwise noted. Also, the ice cream shop and the one functioning miniature golf course were, and are presently, operated by tenants as businesses open to the public. Those are not at issue in the present proceeding.

electrical equipment occurred in July, 1990 and plaintiffs discontinued their fee-charging activities rather than undergo the expense of repairing that equipment. Nevertheless, according to plaintiffs, since that time some of the same types of activities have continued to be conducted on the property, at a lower level of frequency and without any fees being charged to the visiting groups.

The condition of the snack bar/concession stand building was in extreme disrepair at the time of plaintiffs' purchase in 1987. During 1988 and 1989 plaintiffs made some fairly extensive repair and remodeling changes to that building, including removing the broken-down flat roof [which had in earlier years been used for rooftop dancing] and replacing it with an A-frame gabled roof; enclosing the center portion of the building which had previously been an open breezeway, thus creating a large assembly room inside; moving certain wall partitions inside to create additional small rooms for office use and the like; enlarging and upgrading the restrooms; and installing new lighting and ceiling systems. The former concession stand then came to be called the multi-purpose building.

Plaintiffs' non-profit religious organization, Trinity Fellowship. Church ("the Church"), had a congregation which in 1987 was conducting its meetings and services in a high school building in a neighboring municipality. In June of 1989 they were notified that they would have to find a new location because of asbestos problems in the school building. As of July, 1989 they began holding their regular Sunday services, as well as other evening and weekend services and meetings, in the renovated multi-purpose building ("the building"). Offices of staff for both the Church and the Corporation were also established in the building at about that time. Those religious meetings and services have been conducted in the building, year-round, continuously since that time through the present, with one interruption on Sunday, October 17, 1993 as more particularly described below.

The Church, according to the testimony of plaintiffs Rev. Abraham Fenton and his wife Mrs. Eve Fenton, both of whom are ordained ministers, adheres to the Christian religious tradition and beliefs. Its services include prayer, singing, taking of a collection, preaching and fellowship. The services are conducted in the large assembly room of the building, which room is also used by other groups for non-religious purposes such as seminars and dinners at various times. There are no architectural or design features of the exterior or interior of the building which would denote the building as a church structure, such as a steeple, stained glass windows, statues, crucifixes or altar. Rev. Fenton described in his testimony that he has founded several church organizations, and that although none of them during his tenure enjoyed the advantage of having its own church building, in his perspective as a Christian minister, a "church" is created when faithful persons gather to pray and worship, wherever they may be located at the time.[6]

It is undisputed that the zoning ordinance of the Township does not permit a "church" in the C Commercial District zone, although it is a permitted use in the R–2 Residential District zone. (Compl.Ex. O: Chapter 102 of Delanco Code; Compl.Ex. E: Township Zoning Map). The term "church" is not specifically defined in that zoning ordinance.

## B. PERMIT AND CITATION HISTORY

It is necessary to summarize here the history of the official actions taken by plaintiffs and various of the defendants pertaining to the property.

Holiday Lakes was purchased by the Corporation in November, 1987. The Church is the majority shareholder of the Corporation, which Rev. Fenton testified was formed for the purpose of acquiring the property. On May 25, 1988, the Corporation applied to the Planning Board and on or about that date was granted a "site plan waiver" (Compl.Ex. D) which stated that the use of the property would be as a recreational facility (as it had been under the prior owners). Shortly

---

6. The Court can take judicial notice that this view, from solely the religious perspective, is consistent with Biblical scripture, "where two or three are gathered together in my name, there I am in the midst of them." MATTHEW 19:20.

thereafter, plaintiffs or their contractors obtained a series of construction permits for the anticipated repairs and renovations to the building. These construction permits dated between approximately 1988 and 1989 and were issued by the Township Construction Official at the time, defendant Clarence Hubbs.[7] Additional permits were obtained from Construction Official Hubbs at later times, for additional changes or repairs to the property or the building.

The operation of Holiday Lakes by the Corporation as a recreational facility open to the public was terminated in July, 1990, and the property continued to be used and occupied by plaintiffs for various purposes, including worship services, as noted above. During the summer of 1990 some commercial activities in the nature of flea markets were also conducted on the property. In or about August of 1990, the Township Attorney, Mr. Nicholas Costa [who is counsel of record for defendants for the injunctive phase of the present case], was directed by the governing body, the Township Committee ("the Committee") to contact plaintiffs and invite them to the next Committee meeting to discuss those matters. The meeting, which was held on September 5, 1990 was attended by Rev. Fenton and William J. Begley, Esq. on behalf of plaintiffs. The official minutes of that meeting, indicate that there was discussion concerning the improvements to the building and its use for worship services, as well as the flea markets.[8] (Costa Certif.Ex. D: Official Minutes of meeting held September 5, 1990). At that meeting, Mr. Costa stated on the record the Township's position that "the imposed conditions [for the mercantile license] had been agreed upon in May for the recreational facility and that use as a church is a [prohibited] use and that they would have to get a use variance. The changes made to the building to make a meeting room should have been subject to site plan review

due to the change of use. If there is no change of use it would be a site plan waiver." *Id.* Another Township Committee member (McKelvie) expressed concern "that the facility may not have been designed as a meeting facility and there could be safety problems. This is another reason to go through the process of having a specific use for a specific building approved." *Id.* Messrs. Fenton and Begley stated, among other things, that the church services were not the main use of the building and that the meeting room was not set up as a church, but that they were interested in maintaining the good relationship of the Corporation and the Township, and that they would apply to the Zoning Board for an interpretation as to whether a use variance was needed, and if they needed site plan approval they would do that. *Id.* There was also discussion as to whether they were seeking a tax exempt property, and they stated that at the present time they were not seeking tax exempt status.[9] *Id.*

Mr. Costa followed up the Township Committee meeting of September 5, 1990 with a letter to Mr. Begley dated September 11, 1990. (Costa Certif.Ex. C). That letter reiterated the points discussed at the prior meeting, and invited Mr. Begley and his clients to the next regular Committee meeting on October 1, 1990 "in order to prevent further violations to occur and to attempt to contain the situation." No one appeared on behalf of plaintiffs at the October 1 meeting, and as the minutes reflect, the matter was discussed in open session, and various alternatives were explored by the Township Committee. (Hearing Ex. D–2). The record before this Court does not clearly indicate what occurred next, except that the Committee heard nothing further from plaintiffs or Mr. Begley following that meeting.

Rev. Fenton testified that at some time during the same period, late Fall of 1990, he

7. As described below, *infra* part II.C., the position of Construction Official is mandated by state law and is regulated by the New Jersey Department of Community Affairs. In Delanco, it is a part-time position which was filled by Mr. Hubbs until he retired and was replaced by defendant Edward Schaefer as of April 1, 1993.

8. Use of the property for flea markets was discontinued at about that time and is not pertinent to this case for present purposes.

9. The question of possible tax consequences of the events in this case is, in the view of the Court, beyond the scope of this Opinion and may be separately addressed by the parties in later proceedings if necessary.

was visited by the Mayor, the Construction Official, and the Chief of Police, and urged by them to retain an attorney familiar with land use law who could attend to the various matters which had been raised by the Committee. They provided Rev. Fenton with the names of several attorneys, including Carl L. Teraschi, Esq. who was retained. That attorney wrote a letter to the Township Clerk, on behalf of the Church, dated January 23, 1991, requesting a certified list of names and addresses, block and lot numbers of owners within 200 feet of the property, "for the purpose of use in the Zoning Board application." (Costa Certif.Ex. E). That step, according to the testimony of Township Administrator Lameiras, would be the first step in commencing an application for a zoning variance.[10] However, according to the testimony of Rev. Fenton the relationship of plaintiffs with attorney Teraschi was brief and unsatisfactory and was terminated without any further steps being taken by plaintiffs in response to the Township's requests.

The Township Committee had no further contact with plaintiffs until the summer of 1991. At that time, having heard nothing from plaintiffs or Mr. Teraschi concerning the matters raised the previous fall and winter, the Committee caused summonses to be issued in the Municipal Court against the Corporation and Rev. Fenton returnable September 4, 1991 for two types of alleged violations of the Delanco Code: first, under the Site Plan Approval Ordinance (§ 81–1 et seq.) for "failure to obtain a site plan"; and second, under the Zoning Ordinance (§ 102–93) for "fail[ure] to obtain permission to operate a church in a commercial zone" (Hearing Exs. P–8 to 11).[11] Representing plaintiffs in response to those summonses was E. Hunter Taylor, Esq., who entered into a dialogue with the Township Attorney which resulted on December 4, 1991 in an agreement whereby the Corporation pled guilty to failure to obtain a site plan, and the other asserted violations were dismissed.[12] Rev. Fenton testified in the present injunctive proceeding that he did not appear in the Municipal Court on that date and that he did not recall what Mr. Taylor advised him had transpired other than that the plea had been entered, or what if anything Mr. Taylor had told him the Corporation should do next. At any rate, the Corporation thereafter took no steps to apply for a site plan. Rev. Fenton testified that it was his view at the time that no site plan application was needed because of the existing waiver which had been obtained in May, 1988.

During the period while the municipal summonses were pending and Mr. Taylor was representing plaintiffs, a construction permit was issued to the Corporation by Mr. Hubbs, the Construction Official, which stated that the description of the work was "change of use from "M" to "A–4"". That permit, No. 91–131, was issued on October 22, 1991 (Hearing Ex. D–10). Mr. Schaefer, the subsequent Construction Official, testified regarding that type of permit, how it could be used as one step toward obtaining a certificate of occupancy, and why in Mr. Schaefer's subsequent review he concluded that the permit had been issued erroneously by Mr. Hubbs. *See* this part, *infra*.

From the date of the plea on December 4, 1991 until October 1993, plaintiffs filed no applications with either the Planning or Zoning Board, and the Township initiated no further communications with plaintiffs on that subject. Also, no application for a certificate of occupancy for the building was filed by plaintiffs.

---

**10.** Note that a site plan application would go to the Planning Board whereas a zoning use variance would go to the Zoning Board, as described below. At any rate, the fact of Mr. Teraschi's letter is set forth because it indicates that plaintiffs had at that time retained counsel and appeared to be pursuing the land use matters raised by the Township.

**11.** As more particularly described *infra* part II. C., it appears that according to the applicable state statutory scheme, the Planning and Zoning Boards are independent entities whose decisions are appealable to Superior Court, but whose enforcement actions can only be initiated by the Township Committee which is responsible to enforce all Township ordinances including those relating to land use. The authority of the Construction Code Official is derived from a separate source, and involves a different appeal route.

**12.** The plea bore a notation by the court that it was not to be used in a civil action.

On Sunday, October 17, 1993 the plaintiffs were prevented from using the building for their regular worship service pursuant to a Notice of Violation and a Notice of Unsafe Structure issued by Construction Official Edward Schaefer which was enforced by the Township through its Police Department. Considerable testimony was presented by the parties concerning the facts and circumstances surrounding that event. That testimony may be summarized as follows.

Early in October or late September, 1993, the telephone company was repairing some lines on the property which had been damaged in a storm, when it discovered and advised plaintiffs that there was a problem with the electrical grounding system for the building. Plaintiffs, acting through Richard Roberts who was a part-time employee of both the Church and the Corporation, promptly began contacting various electrical contractors. Several of them came to the property from approximately October 6 through 11, but none could specify what the problem was or how to correct it. While this effort was still in progress, on the morning of Thursday, October 14, 1993, one of the electricians who had visited the property telephoned the Township offices and reported to Township Administrator Lameiris that there was a serious electrical problem in the building.[13] Ms. Lameiris immediately conveyed this information by telephone to Mr. Schaefer, who was working at his other part-time job as Construction Official of Cinnaminson that day. Mr. Schaefer immediately called the Corporation offices at the property, and that same afternoon he met with Mr. Roberts and a representative of the electric company (P.S.E. & G. Co.) at the property and performed tests of the electrical system serving the building.

Mr. Schaefer's tests indicated to him that there was a serious electrical problem involving high voltage running into the ground from the building's transformer. He testi-fied that this created a safety hazard within the building and for a large area beyond the building, which could cause very severe bodily harm. The cause of the problem was not discernable at that time, but according to Mr. Schaefer, its effects were evident in his test readings. Upon obtaining those test readings, Mr. Schaefer shut off the power to the building and issued a handwritten Notice of Violation (Hearing Ex. P–15) which referred to the electrical readings and declared the property to be an unsafe structure pursuant to N.J.A.C. 5:23–2.32. He gave this Notice to Mr. Roberts, informing Mr. Roberts in words to the effect that he was going to have to "shut you down".[14] In his testimony Mr. Schaefer did provide Code-related reasons why the building itself was not supposed to be used once it had no power, but those were apparently not discussed between Schaefer and Mr. Roberts. Mr. Schaefer then left the property.

On Friday, October 15, 1993, Mr. Schaefer followed up his handwritten Notice of the previous day with a typed Notice of Unsafe Structure/Notice of Imminent Hazard, dated October 14, 1993, directing the Corporation to immediately vacate the structure (Hearing Ex. P–3). He testified that this was customary, to clean up the handwritten paperwork from the previous day. Also that day, Mr. Schaefer reviewed the entire file pertaining to the property and issued three other Notices of Violation and a letter notification, all dated October 15, 1993 (Hearing Exs. P–4 through P–7). The latter items are discussed below. Mr. Schaefer testified that he issued those documents pursuant to his duty to issue notices at the time violations came to his attention. Mr. Schaefer gave all of those notices to the Township staff that day to mail to the Corporation. Also on that day (Friday), he tried two or three times to deliver the Notice of Immanent Hazard to plaintiffs, but the gates to the property were locked. Mr. Schaefer did not attempt to reach Rev.

---

13. There was disputed testimony over whether the report was that people had been receiving shocks in the building, which dispute the Court does not need to resolve at this time.

14. There was a dispute in the testimony as to whether Schaefer informed Roberts at that time that the building itself was not to be used;

Schaefer contending that he did so, and Roberts contending that his understanding at the time was just that the power was being shut off. This dispute is noted but not resolved here by the Court, except to observe that the words quoted above could bear either interpretation.

Fenton by telephone; however, according to Rev. Fenton's testimony he may have been out of town at least in part, that Thursday and Friday.

Officer Secalis testified that at approximately 4:30 P.M. on Friday, October 15, 1993, he was dispatched to meet with the Mayor who explained that a violation notice concerning a serious electrical problem had been issued the previous day by Mr. Schaefer and delivered to plaintiffs, and that four other notices had been issued and mailed that Friday, but that the Mayor was concerned that the building not be used for services during the weekend for safety reasons. In consultation with the Mayor and Township Attorney Costa, Officer Secalis was instructed to make sure that the typed Notice of Imminent Hazard (Hearing Ex. P–3) was personally delivered to plaintiffs so that they understood that the building was not to be used; but not to interfere with any activities within the building. Officer Secalis was also informed that before he was called into the matter, Police Chief Parsons had tried several times to reach Rev. Fenton by telephone but no one had answered.

On Saturday, October 16, 1993, Officer Secalis tried several times during the day to contact plaintiffs without success, both by calling Rev. Fenton's telephone number and by going to the property, where he found the gates closed, which in his experience indicated that no one was in the building.[15] Finally, at approximately 5:10 P.M., Officer Secalis discovered the gates open, and he entered the property and found Mr. Roberts and another person at the building. He then informed Mr. Roberts that he was there to make sure that they were aware of the electrical hazard notice and that they were not permitted to use the building pending repairs. He delivered to Mr. Roberts a copy of the typewritten Notice of Unsafe Structure (Hearing Ex. P–3), as well as copies of the other notices issued on October 15, 1993 by Mr. Schaefer. At that point, Mr. Roberts contacted Rev. and Mrs. Fenton by telephone, and Officer Secalis repeated the same information to them and advised them that he would be at the property in the morning

to speak with Rev. Fenton. The Fentons expressed their dismay at the short notice that they were receiving and their concern about the services scheduled the next morning.

On Sunday, October 17, 1993, Officer Secalis did go to the property, arriving at approximately 9:00 A.M. He observed that no one was in the building and that chairs had been set up in the outdoor pavilion nearby. He spoke with Ms. Raymond, who was keeping watch from her car near the building. She advised that Rev. Fenton would arrive shortly, and assured him that no one would be in the building. Officer Secalis then left and did not return again that day. The testimony of Rev. and Mrs. Fenton, and Mrs. Raymond, stated that services were held outside in the cold weather that morning, and that it was a most unpleasant and traumatic experience for the congregation, many of whom were families with young children. Since that time, according to their testimony, attendance and collections have been diminished, and members have expressed concern about whether they are going to be permitted by the Township to continue to worship in the building. Nevertheless, the regular services in the building were restored by the following week, and have continued uninterrupted to the present.

On or about Monday, October 18, 1993, electrical contractor John Grandowicz responded to Mr. Roberts' earlier calls and came to the property, where the electrical power remained shut off. He activated the power to make tests, and determined that in his opinion a bonding wire was missing from the transformer, which could produce a hazard of low-level shocks within the building if an appliance was faulty. He installed the bonding wire and turned on the power to the building. Worship services resumed in the building as of that Sunday, October 24, 1993. When Mr. Schaefer inspected the repairs on Friday, October 29, 1993, he continued to obtain high voltage readings from the transformer to the ground, so he did not lift the Notice of Unsafe Structure. Mr. Grandowicz then contacted the manufacturer of the

---

**15.** There are no residences on the property.

transformer (which had been installed only approximately one year earlier), and they analyzed the test readings and advised that the transformer had become faulty and needed to be replaced. Mr. Grandowicz then immediately obtained and installed a new transformer. Mr. Schaefer returned the very next day, Saturday, October 30, 1993, and approved the repairs. Thus, the two electrical notices both dated October 14, 1993 were resolved as of October 30, 1993.

There was some difference in opinion expressed in the testimony of Mr. Schaefer and Mr. Grandowicz regarding the nature and severity of the electrical problems. Mr. Grandowicz testified that in his experience, the missing bonding wire could create a condition called a "floating neutral" which could, in the presence of a faulty appliance in the building, produce low-voltage shocks to people in the building, including in the rest-rooms. He also confirmed that the presence of a faulty transformer was a significant safety hazard which, once detected, required immediate replacement. Thus, although the technical testimony of Messrs. Schaefer and Grandowicz did not entirely agree, there is substantial evidence that as of Thursday, October 14, 1993 when Mr. Schaefer turned off the power, a significant electrical safety hazard existed in the building. It is also undisputed that once the power was off, that hazard was eliminated. However, according to Mr. Schaefer's testimony, he concluded that with the power off, other subcode violations were created with respect to adequate light and fire protection, which required that the building not be used by people until the electrical problem could be corrected.

The four notices which Mr. Schaefer issued on Friday, October 15, 1993 (in addition to the electrical hazard notices issued as of the previous day) were as follows:

    a. Notice of Violation: bath houses by pool area were open at door or window, creating a fire hazard;

    b. Notice of Violation: "Construct a sign without a permit";

    c. Notice of Violation: "A building altered shall not be used or occupied until certificate of occupancy has been issued"; and

    d. Letter advising that Permit # 91–131 [the Change of Use permit issued by Mr. Hubbs on October 22, 1991] had been issued without the required Planning Board or Zoning Board approval and therefore was invalid and was being revoked.

(Hearing Exs. P–4 through P–7).

Each of those Violation Notices carried fine provisions, and advised of a right to appeal within 20 days to the Construction Board of Appeals for the county.

Mr. Schaefer testified that as to the first Notice, the matter was resolved when plaintiffs boarded up the open structures. As to the second Notice, Mr. Schaefer later determined that the sign [which was not in fact recently constructed but had appeared so to him] was not located on the Delanco portion of the property, and accordingly that Notice was withdrawn.[16] As to the third Notice, Mr. Schaefer testified that it is still accurate in that the building has not received a certificate of occupancy since it was remodeled, but this Notice was resolved by the filing on December 7, 1993 of plaintiffs' application for a certificate of occupancy, which application is presently pending.[17] Thus, according to Mr. Schaefer's testimony, all of the Notices issued on October 14 and 15, 1993 have been resolved, and there are currently no unresolved permits in the Construction Code files for the property, except the lack of a certificate of occupancy for the building, which is being addressed through the pending applications for site plan approval and certificate of occupancy.

As to the letter indicating the invalidity of Permit 91–131, Mr. Schaefer explained that a

---

16. In their pleadings and testimony, plaintiffs also refer to a much earlier occasion when they were orally advised by a Township official not to advertise their worship services on that sign. They acquiesced for several years, and then resumed the worship notices, without any negative response from the Township.

17. Mr. Schaefer did note in his testimony that the application as filed was too vague and would need supplementation.

"change of use" permit such as that was just one step in the process of obtaining a certificate of occupancy under the Construction Code. In itself, the permit did not authorize a change of the "use group" classification of the building, which could only be accomplished after all subcode inspections had been satisfactorily completed and the certificate of occupancy had been applied for and granted. In this case the subcode inspections had been performed, over an extended period of time involving at least one electrical correction and re-inspection in 1992, but the certificate of occupancy for the new "use group" had not been applied for. Mr. Schaefer testified that he wrote the letter to point out that the permit had been erroneously issued because of the lack of a new site plan approval, and to inform plaintiffs that such approval was still needed if a certificate of occupancy were to be issued based upon a change in "use group" classification. Mr. Schaefer also testified that based upon the extent of the renovations which were made to the building, a new site plan approval and certificate of occupancy are required. *See* description of the statutory scheme to which this letter referred, *infra* part II.C.

An exchange of correspondence took place between current counsel for plaintiffs, Alicia E. Fenton, Esq., and Mr. Costa as Township Attorney, immediately after the events leading up to Sunday, October 17, 1993. (Compl.Exs. K and L.) Those letters reviewed some of the history and set forth the positions of the writers on the various issues which were then outstanding. In Mr. Costa's letter he advised *inter alia* that in his view a site plan application did need to be filed, and also an application for a certificate of occupancy. Plaintiffs did file a site plan application on or about November 22, 1993, and, as noted above, an application for certificate of occupancy was filed on December 7, 1993. The Verified Complaint in this case was filed on November 22, 1993.

## C. LAND USE PROCEDURES

Defendants supplied the following description of state laws and regulations and local

ordinances which defendants assert are relevant in the circumstances.[18]

There are two state statutes which directly pertain to the local events occurring in this case: the State Uniform Construction Code Act, N.J.S.A. 52:27D–119, *et seq.* ("the Construction Act"); and the New Jersey Municipal Land Use Act, N.J.S.A. 40:55D–1, *et seq.* ("the Land Use Act").

One of the stated purposes of the Construction Act is "to insure adequate maintenance of buildings and structures throughout the State and to adequately protect the health, safety and welfare of people." N.J.S.A. 52:27D–120(e). The Construction Act authorizes the adoption of a State Uniform Construction Code ("the Construction Code"), N.J.S.A. 52:27D–123, and delegates to the Commissioner of the Department of Community Affairs all the powers necessary or convenient to effect the purposes of the Construction Act, including the power to adopt all necessary and appropriate rules and regulations. N.J.S.A. 52:27D–124. The Construction Code is codified at N.J.A.C. 5:23–1, *et seq.* The Construction Act also provides that the Construction Code shall be divided into subcodes. The subcodes are adoptions of the model codes of the Building Officials and Code Administrators International, Inc., the National Electrical Code, and the National Standard Plumbing Code (generally referred to as the "BOCA Code") or some other satisfactory equivalent. N.J.S.A. 52:27D–123(b). The BOCA Code is not found in the New Jersey Administrative Code but is widely used by Construction Code officials and other engineering and construction professionals.

The BOCA Code, Art. 3, contains a description of "use group" classifications. The use group classification of a building will determine which construction standards apply; for example, what plumbing, electrical and fire protection standards must be met. The relevant use groups in this case might be

---

18. Plaintiffs do not dispute the terms of the enactments but do contest their applicability, which dispute is discussed below. The terms themselves are set forth here as facts rather than legal conclusions, because this Court has made only a limited independent review of the statutory scheme at this preliminary stage in the case.

various levels of M (mercantile) or A (assembly). "Use group" classification for purposes of the Code is an entirely separate matter from the concept of "use" as contained in zoning and planning laws, although procedurally an application for "change in use group" can trigger a new site plan requirement and possible zoning "use" review, as described below.

The Construction Code provides that if a building undergoes a "change in use group", a new certificate of occupancy must be obtained. N.J.A.C. 5:23–2.6. The Construction Code also requires a new certificate of occupancy if a building undergoes any significant structural alteration or expansion. N.J.A.C. 5:23–2.23. The Construction Code further requires that for a certificate of occupancy to be issued the property must comply with all other relevant statutes and regulations and have all needed approvals. N.J.A.C. 5:23–2.23. It is this latter requirement which provides the procedural link between the certificate of occupancy process and the site plan application process.

In sum, under the Construction Act and related regulations, in order to do any significant construction on a building, or to "change the use group" of that building, a new certificate of occupancy must be obtained. Further, either of those changes can trigger the necessity of applying to other official bodies such as planning or zoning adjustment boards which must pass upon certain aspects of those changes. Thus, the issuance of a certificate of occupancy is normally the culmination or "perfection" of the various applications processes before various public officials. The commencement of that process may begin with the application for a construction permit or a "change in use group" permit from the Construction Official.

Defendants contend, through counsel, that in this case, under the statutory scheme, Mr. Hubbs, the Township Construction Official at the time, should not have issued the various construction permits which plaintiffs initially obtained in 1988 and 1989, but rather should have directed plaintiffs to apply for issuance of a new site plan, or a new waiver of site plan, before construction commenced, despite the fact that plaintiffs had a site plan waiver

on file. Defendants similarly contend that Mr. Hubbs should not have issued Permit 91–131, which was issued on plaintiffs' application for "change in use group" from M to A–4, in October 1991, without referring plaintiffs to the Planning Board for new action with respect to a site plan. Defendants acknowledge through counsel that this constituted a lapse or failure of enforcement by the Construction Official at that time. Defendants assert, however, that given the extent of the renovations to the building, a new site plan was required under the applicable land use statutes and ordinances; and that the requested "change in use group" should also have triggered the site plan process.

The Land Use Act authorizes the creation of municipal planning boards and sets forth the general powers afforded to planning boards. N.J.S.A. 40:55D–23 to 40:55D–27. The Land Use Act also authorizes the creation of municipal zoning boards of adjustment and sets forth the general powers of these such boards. N.J.S.A. 40:55D–69 to 40:55D–76.

The Land Use Act also defines "site plan." N.J.S.A. 40:55D–7. Chapter 81 of the Delanco Code (Hearing Ex. D–13), which governs site plan approval in the Township, provides in relevant part:

> Except as hereinafter provided, no ... building permit [shall] be issued or construction commenced unless a site development plan is first submitted and approved by the Planning Board of the Township of Delanco; and no certificate of occupancy shall be issued, nor shall occupancy take place until and unless all construction and required improvements shall be completed in conformity with the approved site plan.

Delanco Code, § 81–1.

Subsequent sections of Chapter 81 of the Delanco Code detail the requirements for a site plan application and provide for waiver of any of the requirements under certain conditions. One of the listed requirements is that "[a] site plan ... shall contain ... such other information ... as may be required ... in order to determine that the details of the site plan are in accord with the standards of the Zoning Ordinance." Delanco Code,

§ 81–3.V. Chapter 81 of the Delanco Code also provides that "[a]fter a site plan, including all requirements, has been submitted, the Planning Board shall, within sixty (60) days from that submission, either approve or disapprove the site plan," giving reasons for rejection in the event of a disapproval. Delanco Code, § 81–5. Upon approval a site plan may be submitted to the Construction Official. *Id.* The Land Use Act also provides for public hearings on site plan applications. N.J.S.A. 40:55D–46.

The planning board is responsible under the Land Use Act for investigating all proposed changes, revisions or amendments to the master plan and the zoning map which establishes the zoning districts in a municipality. The planning board submits a report and recommendation to the governing body on all proposals within 35 days of referral to the planning board. The governing body either adopts the report and recommendation, in whole or part, by ordinance, or rejects the report and recommendation. N.J.S.A. 40:55D–26.

The powers of the zoning board of adjustment include the granting of so-called "use" or "D" variances. N.J.S.A. 40:55D–70(d). The zoning board of adjustment is also empowered to "hear and decide requests for interpretation of the zoning map or ordinance." N.J.S.A. 40:55D–70(b). As previously noted, Chapter 102 of the Delanco Code (Compl.Ex. O) permits various uses in a C Commercial District, including variously, "... office, studio ... theater or other place of amusement ... [and] open-air parking lot." Delanco Code, § 102–26. All uses not expressly permitted in a C Commercial District are prohibited. Churches, which are not defined by the Delanco Code, are not a permitted use in a C Commercial District but are permitted in an R–2 Residence District. Delanco Code, § 102–18. The Delanco Code sets forth procedures for applying to the zoning board of adjustment for determinations under its authority.

Under this regulatory scheme the available procedure in a case such as this, where there was significant construction involved, and at least arguably some change in use for purposes of the zoning ordinance, would be to apply to the Township Planning Board for site plan approval or waiver with respect to the renovations, and if directed by the Planning Board, to seek from the Township Zoning Board of Adjustment a use variance or an interpretation that no variance was required under the zoning ordinance. During or after those determinations were made, the Construction Official could determine "use group" classification, arrange for necessary inspections, and ultimately issue a certificate of occupancy.

The position of Construction Official is mandated by the Construction Act and is regulated for licensing purposes by the New Jersey Department of Community Affairs. N.J.S.A. 52:27D–126. A grant or denial of a certificate of occupancy, or a notice of violation or similar notice issued by the Construction Official, is reviewable within a stated number of days by the Construction Board of Appeals for the county. The decisions of that Board may be appealed directly to the Superior Court in an action in lieu of prerogative writ. N.J.S.A. 52:27D–127.

A decision of either the Planning Board or the Zoning Board of Adjustment of the Township may be appealed directly to the Superior Court in an action in lieu of prerogative writ under Rule 46 of the N.J. Rules of Civil Procedure. Enforcement against violations of the planning and zoning ordinances can be initiated only by the Township, by bringing an action in the Municipal Court or the Superior Court. N.J.S.A. 52:27D–138. An action seeking collection of fines for violations of the Construction Act or rules promulgated thereunder can be initiated only by the Township or the State of New Jersey in a municipal or county court, N.J.S.A. 52:27D–138, but in cases of emergency the Construction Official is empowered to declare a property unsafe and order it vacated. N.J.A.C. 5:23–2.32(b) (where unsafe structure endangers life). Such orders are enforceable by the Township through its police. N.J.A.C. 5:23–2.31.

## III. CONCLUSIONS OF LAW

### A. *RIPENESS*

The Court has jurisdiction of this case under 28 U.S.C. Section 1331 and 28 U.S.C.

Section 1343(a)(3). The action is brought pursuant to 42 U.S.C. Section 1983 and 1985 against defendants acting under color of state law.

■ A threshold issue which is clearly presented in this case is whether a justiciable controversy exists at this time. Stated another way, the issue is whether the matter is ripe for judicial intervention. This question must be addressed even where as here, a case is before the court on application for preliminary injunction. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Acierno v. Mitchell*, 6 F.3d 970 (3d Cir.1993).

■ Defendants maintain that since there has been no completed application process and final decision at the local level by the Planning Board and/or Zoning Board, and therefore no grant or denial of a certificate of occupancy by the Construction Official, the filing of this action is premature because the issues are not ripe for judicial review. Plaintiffs argue that because this action is brought under 42 U.S.C. § 1983, they are not required to exhaust their administrative remedies. (Pls.' Reply Br. at 3).

■ It is correct that exhaustion of administrative remedies is not always required prior to commencing a § 1983 action, particularly where First Amendment rights are involved. *See, e.g., Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *McNeese v. Board of Education of Community Unit School District 187*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Hochman v. Board of Education of City of Newark*, 534 F.2d 1094 (3d Cir.1976).

However, this Court notes that

the doctrines of ripeness for adjudication and of exhaustion of administrative remedies are distinct and not interchangeable. While exhaustion is sometimes a jurisdictional prerequisite to a civil suit in a district court, ripeness is a product of the concept of justiciability. Ripeness concerns whether the legal issue at the time

presented in a court is sufficiently concrete for decision.

*United States v. Lightcap*, 567 F.2d 1226, 1232 (3d Cir.1977) (citations omitted); *accord, Taylor Investment, Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1290 n. 10 (3d Cir.1993).

"In this respect, the ripeness doctrine is closely related to the case or controversy requirement of Article III of the United States Constitution." *United States v. Lightcap*, 567 F.2d at 1232 n. 6.

In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), an analogous case brought under 42 U.S.C. § 1983, the plaintiff landowner challenged the application of zoning regulations to the owner's property under concepts of due process and unlawful taking. The United States Supreme Court articulated the distinction between the doctrines of ripeness for adjudication and of exhaustion of administrative remedies in that context as follows:

Respondent asserts that it should not be required to seek variances from the regulations because its suit is predicated upon 42 U.S.C. § 1983, and there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action. The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable. While the policies underlying the two concepts often overlap, the finality requirement is concerned with *whether the initial decision-maker has arrived at a definitive position on the issue* that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Williamson* at 192–93, 105 S.Ct. at 3119–20 (citations omitted) (emphasis added); *see also MacDonald, Sommer & Frotes v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91

L.Ed.2d 285, *reh'g denied,* 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986).

In *Williamson,* the Court set aside a jury verdict, a trial court judgment N.O.V., and an affirmance by the Court of Appeals—which had all been decided on the merits of the takings claim—and held that the District Court should not have allowed the claim to go forward because it was premature. There the property owner had received an adverse preliminary decision on its subdivision application from the Planning Commission but had refused to apply to the zoning board for variances which might have permitted the project to go forward. The Supreme Court held that there had been no conclusive determination by the Planning Commission because the possibility had been left open that the zoning variance would have been granted by the zoning board and the planning board might then have approved the subdivision. *Id.* at 193, 105 S.Ct. at 3120.

In the case at bar, plaintiffs' application to the Delanco Township Planning Board ("the Planning Board") is in its early stages, and it is not yet evident whether the Planning Board will identify a need to apply to the Zoning Board of Adjustment ("the Zoning Board") for one or more variances, or if that is required, what action the Zoning Board will take.

The Court of Appeals for the Third Circuit has had occasion to apply the ripeness doctrine in several recent cases which had aspects similar to the present case. *See Acierno v. Mitchell,* 6 F.3d 970 (3d Cir.1993); *Taylor Investment, Ltd. v. Upper Darby*

*Township,* 983 F.2d 1285 (3d Cir.1993); *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992); and *Felmeister v. Office of Attorney Ethics,* 856 F.2d 529 (3d Cir.1988).

■ The *Felmeister* case involved a § 1983 First Amendment challenge to attorney advertising regulations and a companion disciplinary rule issued by the New Jersey Supreme Court. The New Jersey Supreme Court had created an Advisory Committee to review all proposed advertisements by attorneys. The plaintiffs had prepared proposed advertisements which they contended were likely to run afoul of the rule and subject them to disciplinary action, but plaintiffs had not availed themselves of that procedure. The Court of Appeals for the Third Circuit upheld the dismissal of the complaint on ripeness grounds. In analyzing the issue, Judge Becker, writing for the court, first pointed out the importance of the ripeness doctrine.[19] The court emphasized that "[w]ith regard to administrative agency actions, considerations of ripeness reflect the need 'to protect th[os]e agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Felmeister* at 535 (citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507). In sum, the *Felmeister* court stated, "judicial review is premature when an agency has yet to complete its work by arriving at a definite decision." *Id.* (citing *Suburban Trails, Inc. v. New Jersey Transit Corp.,* 800 F.2d 361, 365 (3d Cir.1986)).[20]

---

**19.** "The ripeness doctrine, like other justiciability doctrines, derives ultimately from the requirement in Article III of the United States Constitution that federal courts are only empowered to decide cases and controversies. 'Even when the constitutional minimum has been met, however, prudential consideration may still counsel judicial restraint.' *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 n. 12 (D.C.Cir. 1986). This court has recognized that considerations of ripeness are sufficiently important that we are required to raise the issue *sua sponte* even though the parties do not." *Felmeister,* 856 F.2d at 535 (citations omitted).

**20.** Judge Becker, writing for the court in *Felmeister,* recognized the controlling authority of the Supreme Court's decision in *Williamson,* 473

U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The court noted that although *Williamson* involved constitutional challenges under the Just Compensation Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment, whereas the *Felmeister* case concerned First Amendment commercial speech, the court did not view that difference as dispositive for purposes of analysis of the ripeness question. In *Salvation Army v. Dep't of Community Affairs of State of New Jersey,* 919 F.2d 183 (3d Cir. 1990), the same reasoning was extended to a First Amendment case involving Free Exercise Clause and Free Speech claims in the context of religious liberties. This Court is acutely mindful, however, that religious liberties are among the most cherished rights afforded a free people under the United States Constitution. "High in the

The recent Third Circuit cases have followed the authority of *Williamson* and *Felmeister* in the context of § 1983 actions arising out of local land use disputes. In *Midnight Sessions,* the plaintiffs claimed that the City of Philadelphia violated their due process rights when it arbitrarily enforced its fire and building regulations by issuing violation notices. The Court of Appeals held *inter alia* that summary judgment should have been granted against the plaintiffs' due process claims because the violation notices were never appealed to the Review Board for "final administrative action." *Midnight Sessions,* 945 F.2d at 686–87.

In *Taylor Investment, Ltd. v. Upper Darby Township,* 983 F.2d 1285, the Court of Appeals for the Third Circuit held that the plaintiffs' procedural and substantive due process and equal protection claims should have been rejected as premature by the District Court on motion to dismiss, rather than on summary judgment, where plaintiffs challenged revocation of a use permit by the local zoning officer but had not appealed to, or sought a variance from, the Township zoning board. *Id.*

Most recently, in *Acierno v. Mitchell,* 6 F.3d 970, the Court of Appeals for the Third Circuit vacated a preliminary injunction which had directed county officials to review plaintiffs' application for a building permit after the application had been denied by the county licensing officer. The court held that, although ripeness was not an issue raised below, plaintiffs' claims asserted under procedural and substantive due process and equal protection should have been dismissed without prejudice because, under the applicable statutory scheme, only the County Board of Adjustment had final authority to interpret the zoning regulations in relation to the issuance of a building permit, and until plaintiffs appealed to that Board, there could be no final justiciable decision on that issue. *Id.* at 976.

These three holdings did not, unlike *Felmeister* and the present case, directly involve

claimed violations of First Amendment rights. However, the reasoning of these cases, in their analysis of the ripeness doctrine in the context of "as applied" challenges to land use regulation decisions, is instructive in the circumstances presented here.

The Court in *Felmeister* applied a two-part test, stating that "[a]ccording to the Supreme Court, questions of ripeness implicate two competing concerns: the fitness of issues for judicial review and the hardship to the parties if judicial consideration is withheld." *Id.* (citing *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515). That test must likewise be applied in this case.

### 1. FITNESS

■ The factors which are relevant to determining whether a question is fit for judicial review include:

> whether the agency action is final; whether the issue presented for decision is one of law which requires no additional factual development; and whether further administrative action is needed to clarify the agency's position, for example, when the challenged prescription is discretionary so that it is unclear if, when or how the agency will employ it.

*Felmeister* at 535–36 (quoting *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986)).

There are at least three interrelated agency processes which may produce final agency actions in this case. None of those processes have progressed to the point of any finality at this time. Those processes are: (1) the pending application to the Planning Board for a site plan [or possibly a waiver of the site plan requirement]; (2) the possible referral of aspects of the site plan to the Zoning Board for variances or an interpretation that no variance is needed; and (3) the pending application to the Construction Official for a certificate of occupancy.

pantheon of civil rights guaranteed by the United States Constitution is the right to be free of laws prohibiting the free exercise of religion or abridging freedom of speech." *Jehovah's Witnesses Assembly Halls of New Jersey v. City of*

*Jersey City,* 597 F.Supp. 972, 981 (D.N.J.1984). It is evident, therefore, that the ripeness doctrine and other doctrines of judicial restraint must be painstakingly analyzed before being imposed in this context.

Plaintiffs argue that they should not be required to go through the site plan application process, stating that "the threshold question of whether religious assemblies on the property changes the use classification for purpose of the Zoning Law must be decided in order to determine whether a site plan is required." (Pls.' Reply Br. at 3). This, plaintiffs contend, is an issue which is fit for judicial review at this time because defendants are insisting that plaintiffs cannot rely upon their original site plan waiver and must file a new site plan application with the Planning Board. Counsel for defendants does not dispute that the Township expects plaintiffs to apply for a new site plan (or a new waiver) from the Planning Board, and eventually to obtain a certificate of occupancy, which the building presently lacks. Also, plaintiffs are correct that the reasons expressed at various times in the past by various representatives of the Township have not always been clear or consistent. However, it is clear to this Court that Chapter 81 of the Delanco Code requires submission and approval of a site plan before any construction is commenced, and that requirement alone does compel plaintiffs to file a site plan with respect to the substantial renovations to the building which were constructed during 1988–90. Delanco Code, § 81–1. The fact that the Construction Official overlooked that requirement when he issued the original building permits does not obviate it as a requirement. *See East Wind Realty, Ltd. v. Board of Adjustment of Township of Wall*, 218 N.J.Super. 412, 417, 527 A.2d 956, 958 (App.Div.1987) ("failure to enforce or apply the law by municipal authorities is not a waiver"). As to whether conducting religious assemblies on the property changes the zoning use classification, that is not a question that must be resolved before plaintiffs file their site plan application, but rather is a question which may arise and require an interpretation by the Zoning Board of Adjustment while the site plan application is pending. The statutory scheme squarely authorizes the Zoning Board to accomplish such purposes.[21]

It is a routine and essential component of the site plan application process that the applicants must specify the actual intended uses of the property. Delanco Code, § 81–3.N. and V. This must be done so that the Planning Board, and if necessary the Zoning Board, can determine whether the plan conforms to the zoning code or may require variances. It must also be done so that the Construction Official can determine the "use group" of the building(s) under the Uniform Construction Code. As previously noted, the "use group" classification will in turn determine the applicable construction safety requirements, which also must be complied with before a certificate of occupancy may issue.

Plaintiffs have stated both in their testimony and through counsel that they intend to comply in all respects with the generally applicable requirements of the Township ordinances pertaining to their property, and that is appropriate. *See, e.g., Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (Free Exercise Clause does not apply to statutes of general applicability that are not specifically directed to religious practices); *Salvation Army v. Dep't of Community Affairs of State of New Jersey*, 919 F.2d 183 (applying *Smith*, 494 U.S. 872, 110 S.Ct. 1595, in context of state statute regulating boarding houses). One of those requirements is that the intended uses be specified in the site plan application, without which the agencies cannot perform their review.

The next factor to consider is whether the issue presented for decision is one of law which requires no additional factual development. That factor also weighs in favor of allowing the land use application process to take its course. If, as plaintiffs contend, the Township zoning ordinance is unconstitutional as applied to them because it impermissi-

---

21. The Court expresses no opinion as to whether plaintiffs were required to apply to the Construction Official for a permit for a "change in use group", or whether that requirement also triggers the necessity of a new site plan review process. It is unnecessary to reach that issue at this time because of the conclusion that the building renovations do trigger the need for such a process.

bly infringes on their religious freedom, then all relevant facts about the intended uses of the property need to be presented in the first instance to the Planning Board, and if an issue is raised there about the intended uses under the zoning ordinance, then to the Zoning Board. There may, for example, be zoning issues raised concerning only plaintiffs' non-religious uses of the property. Such issues would not be germane to the claims asserted in this case. If issues are raised concerning plaintiffs' religious uses of the property, as plaintiffs may reasonably foresee occurring based on past history, then the relevant facts must be presented in the first instance to the Zoning Board, which is the sole initial decision-maker under the statutory scheme. *See Williamson,* 473 U.S. at 192–93, 105 S.Ct. at 3119–20.

The Zoning Board may determine that plaintiffs are not operating as a "church" within the meaning of the zoning ordinance. Such an interpretation would render that constitutional challenge moot. The Zoning Board may instead take the view that the intended use of the building is as a "church", but grant a variance permitting it. That too, much as plaintiffs might disagree with such interpretation, would likely render the issue non-justiciable.[22] A justiciable issue would exist only if the Zoning Board, in a final adverse determination, rejects plaintiffs' arguments on the interpretation of the term "church" as it affects them under the zoning ordinance, and further fails to grant plaintiffs a variance for their religious use of the property. The Zoning Board would need the facts in order to make its determination.

While this Court necessarily takes no position as to the eventual outcome of the issues presented under the Township's local ordinances in this case, it appears that if the Zoning Board were to rule that plaintiffs' use of the building rendered the building a "church" within the meaning of the local ordinances, such a ruling might well be contrary to the views expressed by the New Jersey Supreme Court in the landmark case of *State v. Cameron,* 100 N.J. 586, 498 A.2d 1217 (1985). *Cf. Farhi v. Commissioners of Borough of Deal,* 204 N.J.Super. 575, 499 A.2d 559 (Law Div.1985); *Sexton v. Bates,* 17 N.J.Super. 246, 85 A.2d 833 (Law Div.1951), *aff'd,* 21 N.J.Super. 329, 91 A.2d 162 (App. Div.1952); *George v. Board of Excise of Elizabeth,* 73 N.J.L. 366, 63 A. 870 (Sup.Ct.1906), *aff'd* 74 N.J.L. 816, 67 A. 599 (E & A 1907). Although no New Jersey cases have been located which involved an alleged church use in a commercial zone as distinguished from a residential zone, the reasoning of the *Cameron* decision concerning the meaning of the word "church" in the context of zoning regulation would certainly be relevant.

The narrow holding on the facts in *Cameron* was that a zoning ordinance which excluded "churches and similar places of worship" from a residential district was unconstitutionally vague as applied to a minister who used his home to hold a one-hour religious service each week for his congregation. However, the majority opinion, written by Justice Handler, expressed a distinct disapproval of judicially creating a definition of "church" totally unrelated to the notion of a special building or structure. On this point, the *Cameron* court stated *inter alia* that "any enforcement of the ordinance based on the kind of religion that is being practiced ... would require local zoning officers to observe and evaluate the religious activities of private citizens. Such regulatory license raises the disturbing specter of governmental intrusion—'continuing official surveillance' of religious persons or entities." *Cameron,* 498 A.2d at 1223 (citation omitted). The Court also observed in a footnote that:

> We do not suggest that as matter of due process the term "church" requires some

---

**22.** *Cf. Williamson,* 473 U.S. at 191–94, 105 S.Ct. at 3119–21 (possibility that plaintiff might have been granted variance *if applied for rendered* case non-justiciable because it prevented jury from being able to determine whether, if variance had been granted, plaintiffs would have had the factual basis for a takings claim). *See also Salvation Army v. Dep't of Community Affairs of State of New Jersey,* 919 F.2d 183 (waiver by agency of certain regulatory provisions as to plaintiffs rendered plaintiffs' constitutional challenges to those provisions non-justiciable). This Court expresses no view as to whether, if plaintiffs in this case were granted variances which mooted their constitutional claims, they could nevertheless appeal the legality of the Zoning Board's interpretation by action in lieu of prerogative writ in the state court.

further definition whenever used in a zoning ordinance. As noted, the term "church" can have a sufficiently definite core meaning to withstand a facial attack on the grounds of vagueness. In this case, the Township applied the term to a set of facts lying well outside the definitional core. Further, the standard used in this case to determine vagueness is stringent because constitutional rights are involved, rights so important that a high level of scrutiny is required to assure they are not impermissibly restricted.

*Id.* at 1224 n. 3.

Accordingly, the *Cameron* court concluded:

In sum, a broad range of possible meanings may be imputed to the phrase, "churches and similar places of worship," in the Franklin Township zoning ordinance. Many of these definitions emphasize only the character of religious activity that is undertaken. It cannot, however, be determined with sufficient certainty what kinds of religious practices were intended to be governed by the ordinance. Nevertheless, it may be reasonable to ascribe a clear core meaning to the critical phrase used in the ordinance, one that avoids a determination that the ordinance is totally vague and void in its entirety. *Such a core meaning would be more specific than one dependent solely upon the nature of the religious activity that occurs; it would involve an understanding of the term church in terms of both its architectural design and construction and its actual primary religious use.* We nonetheless are satisfied that such a core meaning would not encompass a single-family house that is used for one hour, once each week as the temporary location to hold rather modest religious services of a small congregation.

*Id.* at 1225 (emphasis added).

The *Cameron* court did not, as in this case, have to grapple with the issue of *how much* religious use of a building might suffice to render it a "church", as distinguished from *what kind* of religion was being practiced at the site, because the amount of religious use there was clearly ancillary and infrequent. But the definitional test which the court appeared to approve was one based on *both* architectural design *and* actual primary religious use. Such a test, applied using the stringent standard necessary where such important constitutional rights are involved, would be unlikely to be satisfied by the activities of plaintiffs in their use and renovation of the "multi-purpose" building in this case, at least on the present record before this Court.

The third factor identified in *Felmeister* on the issue of fitness for judicial review is whether administrative action is needed to clarify the agency's position, as when agency discretion is involved. Here, the discretion of both the Planning Board and the Zoning Board are brought into the picture, because the Planning Board has discretion, based on the contents of the site plan application, to decide whether or not it requires Zoning Board review; and of course the Zoning Board has the discretion and responsibility to interpret the zoning ordinance on a disputed issue. The very fact that, to plaintiffs' understandable frustration, the statements by Township officials on this issue have varied from person to person and from time to time, underscores the importance of adhering to the regulatory scheme and reducing the issue to a definitive position by the initial decision-maker in each instance where agency action is required on plaintiffs' pending applications.

The courts have stressed the particular importance of a complete record in cases involving potential clash between religious liberty interests and local planning and zoning laws. *See, e.g., Jehovah's Witnesses Assembly Hall of Southern New Jersey v. Woolwich Township of New Jersey,* 223 N.J.Super. 55, 537 A.2d 1336 (App.Div.1988). In *Woolwich,* the appellate court reversed and remanded to the trial court a case which asserted a facial constitutional challenge to a zoning ordinance prohibiting churches in a residential zone. The court stated that the case had been decided by the trial judge upon "a narrowly constructed record with essentially no findings of fact," which was held to be insufficient for appellate review. *Woolwich,* 537 A.2d at 1338. Listing some of the factual issues which required exploration, the court declared as follows:

The exclusion of churches from residential districts has been described as one of the most common church-zoning issues facing the courts over the last three decades.... But there is one common theme in the cases and academic comment: the court must make a thorough exploration and a careful evaluation of the facts bearing upon the competing religious and governmental interests.

*Id.* at 1338–39 (citations omitted).

In *Woolwich*, the trial court at least had a transcript of Planning Board hearings. In this case, the local agency proceedings have not yet been concluded. The facts to be adduced in those proceedings, and the decisions and reasons given by the local agencies, must be the starting point for any judicial review, whether on constitutional grounds or on any other legal theories.

## 2. HARDSHIP

The Court of Appeals for the Third Circuit noted in *Felmeister* that, as to the second prong of the ripeness test, "it is settled that in order for the parties' hardship to be sufficient to overcome prudential interests in deferral, that hardship must be both immediate and significant." *Felmeister*, 856 F.2d at 537. The hardship that plaintiffs assert in support of their application for preliminary injunction is that with the uncertainty raised by the Township about their legal right to worship in the building, and especially in the aftermath of the incident which prevented them from conducting services in the building on October 17, 1993, the congregation has become concerned and distressed, and attendance and collections have both declined. Plaintiffs assert their fear that if relief is deferred until the agency processes are completed, the congregation may have dwindled even further.

The Court can and does view with genuine empathy the current distress of the plaintiffs and their congregation. The land use application process can be detailed, confusing and expensive, although it need not be especially time-consuming given the time limits contained in the Township ordinances. However, this type of burden is precisely what is envisioned in the regulatory scheme relating to land use planning. In addition, plaintiffs have been on notice of the need to file a new site plan application with the Planning Board since at least September, 1990.

Religious services are being conducted by plaintiffs in the building at the present time, and have been so conducted since July 1989, with the exception of the Sunday noted above. There is no immediate threat of any governmental interference with plaintiffs' religious use of the property on the basis of violations of the zoning ordinance. Defendants have stated in their papers and their testimony that as long as plaintiffs are actively proceeding with their pending site plan and certificate of occupancy applications, they will take no enforcement action. Indeed, none is pending at this time. This case is factually similar in this respect to the decision of the Court of Appeals for the Third Circuit in *Salvation Army v. Dep't of Community Affairs of State of New Jersey*, 919 F.2d 183, in which the rule of justiciability was stated and applied as follows:

Where the plaintiff seeks a declaratory judgment with respect to the constitutionality of a state statute, even where the attack is on First Amendment grounds, there must be a "real and immediate" threat of enforcement against the plaintiff. *Hardwick v. Bowers*, 760 F.2d 1202, 1206–07 (11th Cir.1985), *rev'd on other grounds*, 478 U.S. 186 [106 S.Ct. 2841, 92 L.Ed.2d 140] (1986)....

Here the current record reflects not only the absence of a threat of enforcement but an express assurance that there will be no enforcement against TSA of the waived provisions of the statute.... In effect, the statute is enforceable by the defendants only prospectively, and the defendants' actions have, at a minimum, bestowed a grace period on TSA....

.    .    .    .    .

In sum, we conclude that the defendants' assurance that the state will not enforce various statutory provisions against TSA suffices to remove those provisions from the scope of the current controversy.

*Id.* at 192–193 (citations omitted).

Accordingly, in this case the hardship to plaintiffs is not of the immediate and signifi-

cant nature required to create justiciability at this time.

There is another aspect to the hardship inquiry which bears noting, and that is the hardship to defendants and the public if this case is permitted to proceed in court before a full proceeding can be conducted locally. First, the defendants and thus the public, would be further subjected to the expense of litigation on an issue which might well be mooted by local agency action on the pending applications. Also, the public itself has a myriad of interests which may be affected by land use disputes, and those interests also militate in favor of deferring judicial action while matters are pending locally. *See generally* R.S. Cohen, D.K. Wolfson and K.M. DalCortino, *Settling Land Use Litigation While Protecting the Public Interest: Whose Lawsuit Is This Anyway?*, 23 Seton Hall L.Rev. 844 (1993). Finally, returning to the reason behind the doctrine of ripeness, in the administrative setting the courts must weigh heavily the need to protect agencies from judicial interference until they have completed their work and the concrete effect upon plaintiffs can be determined. *Felmeister*, 856 F.2d at 535.

For all of the foregoing reasons, this Court concludes that the issues pertaining to the pending local agency proceedings are not ripe for adjudication at this time.

## B. INJUNCTION

Plaintiffs seek a preliminary injunction restraining defendants, *inter alia*, from:

a. preventing or attempting to prevent by using police, threats, obstruction, interference, intimidation or coercion on any persons from entering onto the property and worshipping in the building or elsewhere on the property;

b. preventing or attempting to prevent by using police, threats, obstruction, interference, intimidation or coercion on plaintiffs in the conduct of their business affairs on the property;

c. preventing or attempting to prevent the approval of "the abbreviated version of a site plan" for the property which was filed on November 22, 1993;

d. engaging in repeated inspections in order to find violations of state, county, local or municipal laws;

. . . . .

f. ordering, ... or assisting ... the revocation or suspension of any permits, licenses, certificates or site plan waivers held by plaintiffs....

(Pls.' Proposed Order at 3–4).

In determining whether to grant or deny preliminary injunctive relief, a court considers the following:

(1) whether the movant will likely succeed on the merits of the litigation,

(2) whether the movant will be irreparably injured if relief is not granted,

(3) the possibility of harm to other interested persons if the injunction is granted or denied, and

(4) the public interest.

*Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191–92 (3d Cir.1990); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197–98 (3d Cir.1990).

The discussion, *supra* part III.A., sets forth the reasons why the issues regarding the pending land use applications are not viewed by this Court as ripe for adjudication. That reasoning applies as well to the requested items of injunctive relief, which can be seen as directly involving the current local administrative processes. *See Acierno v. Mitchell*, 6 F.3d at 973, 976.

The Court is mindful that an expansive reading of plaintiffs' Verified Complaint and injunctive application can include the substantive due process claim that government has deliberately and arbitrarily abused its power in its actions toward plaintiffs to date. In *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667 (3d Cir.1991), the Court of Appeals for the Third Circuit described this type of claim as follows:

[A]llegations that the government's actions in a particular case were motivated by bias, bad faith, or improper motive, such as partisan political reasons or personal reasons unrelated to merits of the plaintiffs' application, may support a finding of sub-

stantive due process violation. Additionally, the Court of Appeals for the First Circuit has stated that a government's action may violate substantive due process if the plaintiff could show a "fundamental procedural irregularity, racial animus or the like."

*Midnight Sessions,* 945 F.2d at 683 (citations omitted).

Significantly, the court in *Midnight Sessions* also emphasized that "a violation of state law in itself does not constitute a denial of substantive due process.... [F]ederal courts do not sit in federal question cases to grant remedies for mere violations of state law." *Id.* at 684.

Plaintiffs have also raised in their pleadings issues relating to past and current actions of defendants on constitutional grounds including freedom of speech, religion and assembly, and equal protection.[23]

On the issue of likelihood of success on the merits of these claims, the Court has carefully reviewed and considered all of the evidence presented by both sides in the injunctive proceeding which is too voluminous to address here in detail, and concludes that such a likelihood has not been sufficiently established. What the evidence amply demonstrates is that at various times each side has made errors, failed to communicate, changed its communicated positions, and delayed or neglected to attend diligently to matters of mutual concern. These incidents, occurring over an extended period of time, appear to have produced exasperation and a mutual lack of trust at the local level. But the pattern which emerges from the evidence before the Court at this juncture does not appear to be one of improper governmental action satisfying any of the tests for a deprivation of rights of constitutional dimensions.

The remaining factors to be weighed by a court in considering an application for a preliminary injunction are the likelihood of irreparable harm, balance of hardship, and interest of the public. Those issues have been previously addressed in the Court's discussion of ripeness, *supra* part III.A.2., and that discussion is applicable here and is incorporated by reference.

Applying these standards to the case at bar, the Court finds that preliminary injunction is not appropriate as to the substantive due process claim and related federal constitutional issues. Further, due to the fact that the currently pending administrative proceedings, which have been held to be premature for adjudication, are inextricably related to the constitutional claims directed to past events, those claims will be stayed in the interests of judicial economy until further order of the Court. The case will be administratively terminated at this time. However, the Court will retain jurisdiction, and either party shall have the right to move to reopen for good cause.[24] *Cf. Jehovah's Wit-*

---

**23.** The Verified Complaint contains the following claims against defendants, alleged to be acting alone, either individually or in their official capacity, (42 U.S.C. § 1983) and in conspiracy (42 U.S.C. § 1985): Count 1—using threats and interference to deprive plaintiffs of their freedom to engage in religious speech; Count 2—using threats and interference to prohibit plaintiffs from exercising their religion; Count 3—using threats and interference to deprive plaintiffs of their freedom of assembly; Count 4—causing repeated inspections of the building in violation of plaintiffs' right to privacy; Count 5—discriminatory enforcement of local laws against plaintiffs in violation of equal protection; Count 6—prohibiting religious use as distinguished from other uses of the building, in violation of equal protection; Count 7—refusing to refund taxes overpaid due to an assessment error, causing double taxation in violation of plaintiffs' property rights; Count 8—revoking previously issued permits without due process; Count 9—[this is a declaratory judgment count seeking interpreta-

tion of the Zoning Code as to whether the term "church" applies to the building and plaintiffs' religious use of it]. Trial by jury is demanded on Counts 1 through 8.

**24.** This Court notes that, once there has been a final determination rendered in the currently pending administrative proceedings, should either of the parties then move to reopen, this Court at such time will have to consider whether it should abstain from exercising jurisdiction under the *Pullman* doctrine in order to give the state courts the opportunity to construe any unsettled issues on appeal. *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Kennecott Corp. v. Smith,* 637 F.2d 181, 184–85 (3d Cir.1980).

If, upon motion to reopen, this Court were to determine (1) that there were uncertain state law issues underlying the federal constitutional claims, (2) that resolution of these state law issues by the state courts would obviate the need

*nesses Assembly Halls of New Jersey v. City of Jersey City,* 597 F.Supp. 972, 983 (D.N.J. 1984); *Evans v. Midland Enterprises, Inc.,* 704 F.Supp. 106, 107 (M.D.La.1989).

An Order accompanies this opinion.

## ORDER

For the reasons stated in the accompanying Opinion,

**IT IS** on this 10th day of February, 1994, **ORDERED** that plaintiffs' application for preliminary injunction is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the Court, on its own motion *sua sponte,* hereby **STAYS** the adjudication of all issues pertaining to the plaintiffs' applications which are currently pending in Delanco Township for site plan approval and a certificate of occupancy for the subject property, until further order of the Court; and

**IT IS FURTHER ORDERED** that in the interests of judicial economy, any and all remaining issues in the case, and all pleadings and discovery practice with respect thereto, are likewise **STAYED** until further order of the Court; and

**IT IS FURTHER ORDERED** that this action is hereby **ADMINISTRATIVELY TERMINATED** without prejudice to the right of either party to move to reopen upon a showing of good cause.

for or substantially narrow the scope of the adjudication of the constitutional claims, and (3) that an erroneous interpretation of state law by this court would be disruptive of important state policies, the appropriate course of action would be to exercise abstention. *D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir.1978).